[855 NE2d 1, 821 NYS2d 770]

DANIEL HERNANDEZ et al., Appellants, v VICTOR L. ROBLES, as City Clerk of the City of New York, Respondent.

SYLVIA SAMUELS et al., Appellants, v NEW YORK STATE DEPARTMENT OF HEALTH et al., Respondents.

In the Matter of ELISSA KANE et al., Appellants, v JOHN MARSOLAIS, as Albany City Clerk, et al., Respondents.

JASON SEYMOUR et al., Appellants, v JULIE HOLCOMB, as City Clerk of the City of Ithaca, et al., Respondents.

Argued May 31, 2006; decided July 6, 2006

**POINTS OF COUNSEL**

*Lambda Legal Defense and Education Fund, Inc.,* New York City (*Susan L. Sommer, David S. Buckel* and *Alphonso David* of counsel), and *Kramer Levin Naftalis & Frankel LLP* (*Jeffrey S. Trachtman, Norman C. Simon* and *Darren Cohen* of counsel), for appellants in the first above-entitled action. I. The marriage ban violates plaintiffs' due process rights under the New York Constitution by denying them, without a compelling justification, the fundamental right to marry the person of their choice. (*Rivers v Katz,* 67 NY2d 485; *Matter of Aliessa v Novello,* 96 NY2d 418; *People v Scott,* 79 NY2d 474; *People v P.J. Video,* 68 NY2d 296; *Cooper v Morin,* 49 NY2d 69; *People v LaValle,* 3 NY3d 88; *Baker v Nelson,* 409 US 810; *Wynehamer v People,* 13 NY 378; *Matter of Jacobs,* 98 NY 98; *Matter of Doe v Coughlin,* 71 NY2d 48.) II. The marriage exclusion fails equal protection scrutiny under the elevated standards applicable to denials of fundamental rights and to classifications based on sexual orientation or sex. (*Alevy v Downstate Med. Ctr. of State of N.Y.,* 39 NY2d 326; *Lawrence v Texas,* 539 US 558; *Brown v State of*

*New York,* 9 AD3d 23; *People v Alvarez,* 70 NY2d 375; *People v Scott,* 79 NY2d 474; *Under 21 v City of New York,* 108 AD2d 250, 65 NY2d 344; *Padula v Webster,* 822 F2d 97; *Ben-Shalom v Marsh,* 881 F2d 454; *Matter of Valentine v American Airlines,* 17 AD3d 38.) III. The exclusion of same-sex couples from marriage does not rationally serve any legitimate government interest. (*Seymour v Holcomb,* 7 Misc 3d 530; *Matter of Shields v Madigan,* 5 Misc 3d 901; *Romer v Evans,* 517 US 620; *People v Liberta,* 64 NY2d 152; *People v Onofre,* 51 NY2d 476; *McMinn v Town of Oyster Bay,* 66 NY2d 544; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *People v Abrahams,* 40 NY2d 277; *Heller v Doe,* 509 US 312.) IV. The only proper constitutional remedy is judicial construction of the Domestic Relations Law to grant same-sex couples full marriage rights. (*People v Liberta,* 64 NY2d 152; *Califano v Westcott,* 443 US 76; *Matter of Lisa M. UU. v Mario D. VV.,* 78 AD2d 711; *Goodell v Goodell,* 77 AD2d 684; *Childs v Childs,* 69 AD2d 406; *People v Scott,* 79 NY2d 474; *Lawrence v Texas,* 539 US 558; *West Virginia Bd. of Ed. v Barnette,* 319 US 624; *People v LaValle,* 3 NY3d 88.)

*Michael A. Cardozo, Corporation Counsel,* New York City (*Leonard Koerner, Marilyn Richter* and *Ronald E. Sternberg* of counsel), for respondent in the first above-entitled action. I. The Domestic Relations Law's limitation of marriage to one male and one female does not contravene the Equal Protection Clause of the New York Constitution. (*Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *Dorsey v Stuyvesant Town Corp.,* 299 NY 512, 339 US 981; *Matter of Esler v Walters,* 56 NY2d 306; *Washington v Confederated Bands & Tribes of Yakima Nation,* 439 US 463; *Hicks v Miranda,* 422 US 332; *Brady v State of New York,* 80 NY2d 596, 509 US 905; *Mandel v Bradley,* 432 US 173; *Matter of Cooper,* 187 AD2d 128, 82 NY2d 801; *Zablocki v Redhail,* 434 US 374; *Raum v Restaurant Assoc.,* 252 AD2d 369.) II. The Domestic Relations Law's limitation of marriage to one male and one female does not violate plaintiffs' rights to due process of law. (*Hope v Perales,* 83 NY2d 563; *Massachusetts Bd. of Retirement v Murgia,* 427 US 307; *Baker v Nelson,* 409 US 810.) III. If this Court concludes that the Domestic Relations Law is unconstitutional, the Court should stay entry of judgment in order to permit the Legislature to take such action as it may deem appropriate. (*Washington v Confederated Bands & Tribes of Yakima Nation,* 439 US 463.)

*Richard E. Barnes,* Albany, and *Paul Benjamin Linton,* North-

brook, Illinois, for New York State Catholic Conference, amicus curiae in the first above-entitled action. I. New York law does not authorize same-sex marriage. (*Matter of Storar,* 52 NY2d 363, 454 US 858; *Storrs v Holcomb,* 168 Misc 2d 898, 88 NY2d 1063, 245 AD2d 943; *Anonymous v Anonymous,* 67 Misc 2d 982; *Matter of Jenkins,* 133 Misc 2d 420; *Frances B. v Mark B.,* 78 Misc 2d 112; *Matter of Shields v Madigan,* 5 Misc 3d 901; *Seymour v Holcomb,* 7 Misc 3d 530; *Matter of Cooper,* 187 AD2d 128, 82 NY2d 801; *Raum v Restaurant Assoc.,* 252 AD2d 369; *Matter of Valentine v American Airlines,* 17 AD3d 38.) II. Reserving marriage to opposite-sex couples does not violate the due process guarantee of article I, § 6 of the New York Constitution. (*Matter of Doe v Coughlin,* 71 NY2d 48; *Crosby v State of N.Y., Workers' Compensation Bd.,* 57 NY2d 305; *People v Onofre,* 51 NY2d 476; *People v Shepard,* 50 NY2d 640; *Delan v CBS, Inc.,* 91 AD2d 255; *Matter of Berger v Adornato,* 76 Misc 2d 122; *Cooper v Morin,* 49 NY2d 69; *Levin v Yeshiva Univ.,* 96 NY2d 484; *People v De Stefano,* 121 Misc 2d 113; *Cherry v Koch,* 129 Misc 2d 346; *Matter of Mary of Oakknoll v Coughlin,* 101 AD2d 931.) III. Reserving marriage to opposite-sex couples does not violate the equal protection guarantee of article I, § 11 of the New York Constitution. (*Baker v Nelson,* 409 US 810; *Hicks v Miranda,* 422 US 332; *Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *Matter of Esler v Walters,* 56 NY2d 306; *Dorsey v Stuyvesant Town Corp.,* 299 NY 512, 339 US 981; *Matter of Cooper,* 187 AD2d 128; *People v Liberta,* 64 NY2d 152; *People v Whidden,* 51 NY2d 457, 454 US 803; *Loving v Virginia,* 388 US 1; *Washington v Davis,* 426 US 229.) IV. Reserving marriage to opposite-sex couples is rationally related to multiple legitimate state purposes. (*Affronti v Crosson,* 95 NY2d 713; *Lawrence v Texas,* 539 US 558; *Sweinhart v Bamberger,* 166 Misc 256, 254 App Div 665; *Morris v Morris,* 31 Misc 2d 548; *Smelt v County of Orange,* 374 F Supp 2d 861; *Adams v Howerton,* 486 F Supp 1119; *Lofton v Kearney,* 157 F Supp 2d 1372, *affd sub nom. Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804; *Wilson v Ake,* 354 F Supp 2d 1298; *FCC v Beach Communications, Inc.,* 508 US 307; *Village of Belle Terre v Boraas,* 416 US 1.)

*Roger B. Adler, P.C.,* New York City (*Roger Bennet Adler* of counsel), for New York State Conservative Party, amicus curiae in the first above-entitled action. I. The Domestic Relations Law's restriction of marriage to heterosexual couples is not unconstitutional. (*Matter of Klein [Hartnett],* 78 NY2d 662, 504 US 912; *Hope v Perales,* 83 NY2d 563; *Courtroom Tel. Network LLC*

*v State of New York,* 5 NY3d 222; *Fearon v Treanor,* 272 NY 268; *Golden v Clark,* 76 NY2d 618; *D'Amico v Crosson,* 226 AD2d 34, 93 NY2d 29; *Reno v Flores,* 507 US 292; *Tucker v Toia,* 43 NY2d 1; *Loving v Virginia,* 388 US 1; *Baker v Nelson,* 409 US 810.)

*American Center for Law & Justice Northeast, Inc.,* New Milford, Connecticut (*Vincent P. McCarthy* and *Kristina J. Wenberg* of counsel), admitted pro hac vice, for City Action Coalition, amicus curiae in the first above-entitled action. I. Supreme Court decisions establishing marriage as a fundamental right are premised on the inextricable link between marriage as a union between a man and a woman, and the procreation that typically results from that union. (*Skinner v Oklahoma ex rel. Williamson,* 316 US 535; *Loving v Virginia,* 388 US 1; *Griswold v Connecticut,* 381 US 479.) II. *Lawrence v Texas* (539 US 558 [2003]) established homosexuals' right to be free from government intrusion into their relationships, not a right to government endorsement of their relationships. (*Bowers v Hardwick,* 478 US 186; *Washington v Glucksberg,* 521 US 702; *Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804; *Wilson v Ake,* 354 F Supp 2d 1298.) III. Marriage is a covenant between a man and a woman for the purpose of securing the well-being of children that typically result from the couple's union. IV. Redefining marriage to include same-sex couples will eventually diminish marriage and endanger the well-being of children. (*Eisenstadt v Baird,* 405 US 438; *Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804; *United States v Virginia,* 518 US 515; *Ballard v United States,* 329 US 187.) V. Once marriage is redefined to include same-sex unions, there is no principled basis upon which to exclude any two or more people who have a close interpersonal relationship.

*Paul, Weiss, Rifkind, Wharton & Garrison LLP,* New York City (*Roberta A. Kaplan* and *Andrew J. Ehrlich* of counsel), *American Civil Liberties Union Foundation* (*James D. Esseks* and *Sharon M. McGowan* of counsel) and *New York Civil Liberties Union Foundation* (*Donna Lieberman* and *Arthur Eisenberg* of counsel), for appellants in the second above-entitled action. I. New York's marriage law denies gay and lesbian people the fundamental right to marry the person they love. (*Rivers v Katz,* 67 NY2d 485; *Hope v Perales,* 83 NY2d 563; *People v Onofre,* 51 NY2d 476; *Cooper v Morin,* 49 NY2d 69; *People ex rel. Portnoy v Strasser,* 303 NY 539; *People v De Stefano,* 121 Misc 2d 113; *Griswold v Connecticut,* 381 US 479; *Loving v Virginia,* 388 US

1; *Zablocki v Redhail*, 434 US 374; *Boddie v Connecticut*, 401 US 371.) II. New York's marriage law violates the New York Constitution because it fails even rational basis review. (*Brown v State of New York*, 89 NY2d 172; *Cleburne v Cleburne Living Center, Inc.*, 473 US 432; *Matter of Doe v Coughlin*, 71 NY2d 48; *Abberbock v County of Nassau*, 213 AD2d 691; *Lovelace v Gross*, 80 NY2d 419; *Affronti v Crosson*, 95 NY2d 713; *Port Jefferson Health Care Facility v Wing*, 94 NY2d 284; *Dalton v Pataki*, 5 NY3d 243; *Crosby v State of N.Y., Workers' Compensation Bd.*, 57 NY2d 305; *People v Liberta*, 64 NY2d 152.) III. The exclusion of same-sex couples from marriage fails heightened scrutiny under the Equal Protection Clause. (*People v P.J. Video*, 68 NY2d 296; *Cleburne v Cleburne Living Center, Inc.*, 473 US 432; *Frontiero v Richardson*, 411 US 677; *Brown v State of New York*, 250 AD2d 314; *Massachusetts Bd. of Retirement v Murgia*, 427 US 307; *San Antonio Independent School Dist. v Rodriguez*, 411 US 1; *Matter of Valentine v American Airlines*, 17 AD3d 38; *Matter of Cooper*, 187 AD2d 128; *Bowers v Hardwick*, 478 US 186; *Lawrence v Texas*, 539 US 558.)

*Brian M. DeLaurentis, P.C.*, New York City (*Brian M. DeLaurentis* of counsel), for Lesbian, Gay, Bisexual and Transgender Law Association of Greater New York, Inc., amicus curiae in the first and second above-entitled actions. I. Protecting your loved ones and your committed relationship with the rights accorded through marriage is the deeply rooted fundamental right at issue. (*Planned Parenthood of Southeastern Pa. v Casey*, 505 US 833; *Romer v Evans*, 517 US 620; *Bennett v Bennett*, 116 NY 584; *Fearon v Treanor*, 272 NY 268, 301 US 667; *Loving v Virginia*, 388 US 1; *Millington v Southeastern El. Co.*, 22 NY2d 498; *Washington v Glucksberg*, 521 US 702.) II. The purported purposes of marriage asserted by the Appellate Division Departments fail to pass constitutional muster. (*Griswold v Connecticut*, 381 US 479; *Eisenstadt v Baird*, 405 US 438; *People v Onofre*, 51 NY2d 476; *Lawrence v Texas*, 539 US 558; *Matter of Jacob*, 86 NY2d 651; *Matter of Raquel Marie X.*, 76 NY2d 387; *Tucker v Toia*, 43 NY2d 1; *People v Marx*, 99 NY 377; *People v Gillson*, 109 NY 389; *People ex rel. Duryea v Wilber*, 198 NY 1.) III. The daily experiences of this amicus amply demonstrate the due process inequities gay and lesbian citizens regularly endure because the presently existing system of separate but less than equal is a failure. (*O'Brien v O'Brien*, 66 NY2d 576; *Dallas v Stanglin*, 490 US 19; *Correa v Maimonides Med. Ctr.*, 165 Misc 2d 614; *Langan v St. Vincent's Hosp. of N.Y.*, 25 AD3d 90; *Silver v Starrett*, 176 Misc 2d 511; *Matter of Alison D. v Virginia M.*,

77 NY2d 651; *Bowers v Hardwick,* 478 US 186.) IV. The sensible conclusion is to permit same-sex couples to marry each other.

*Willkie Farr & Gallagher LLP,* New York City (*Martin Klotz, Joanna Rotgers* and *Jeffrey S. Siegel* of counsel), for Women's Bar Association of the State of New York and others, amici curiae in the first and second above-entitled actions. I. The state law prohibiting same-sex couples from marrying is gender-based discrimination that does not withstand scrutiny. (*Reed v Reed,* 404 US 71; *Loving v Virginia,* 388 US 1; *Califano v Westcott,* 443 US 76; *Califano v Goldfarb,* 430 US 199; *McLaughlin v Florida,* 379 US 184; *Bob Jones Univ. v United States,* 461 US 574; *J. E. B. v Alabama ex rel. T. B.,* 511 US 127; *People v Blunt,* 162 AD2d 86; *People v Liberta,* 64 NY2d 152; *Matter of Carolyn B.,* 6 AD3d 67.) II. The state law prohibiting same-sex couples from marrying is gender stereotype discrimination that does not withstand judicial scrutiny. (*Orr v Orr,* 440 US 268; *Mississippi Univ. for Women v Hogan,* 458 US 718; *Hoyt v Florida,* 368 US 57; *Frontiero v Richardson,* 411 US 677; *People ex rel. Watts v Watts,* 77 Misc 2d 178; *Loving v Virginia,* 388 US 1; *People v Whidden,* 51 NY2d 457; *People v Liberta,* 64 NY2d 152; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *Califano v Westcott,* 443 US 76.)

*Fried, Frank, Harris, Shriver & Jacobson LLP,* New York City (*Bonnie Steingart, Jonathan F. Lewis, Jennifer L. Colyer, Edward J. Jacobs* and *Tico A. Almeida* of counsel), for Academy for Jewish Religion and others, amici curiae in the first and second above-entitled actions. I. Although marriage has both a religious and a civil meaning, the Domestic Relations Law defines and governs only the institution of civil marriage. (*Maynard v Hill,* 125 US 190; *Avitzur v Avitzur,* 58 NY2d 108, 464 US 817.) II. Allowing same-sex couples to participate in civil marriage will not impinge on the free exercise rights of religious groups. (*Williams v Bright,* 230 AD2d 548; *Grumet v Board of Educ. of Kiryas Joel Vil. School Dist.,* 81 NY2d 518, 512 US 687.) III. The issue of civil marriage between same-sex couples must be decided as a matter of civil law, without reference to any particular religious tradition. (*Lawrence v Texas,* 539 US 558; *People v Liberta,* 64 NY2d 152; *People v Onofre,* 51 NY2d 476; *Moore v East Cleveland,* 431 US 494.) IV. In addition to supporting full civil marriage equality, many religious traditions already celebrate the marriages of same-sex couples in their religious communities.

*Ross D. Levi,* Albany, and *Cravath, Swaine & Moore LLP,*

New York City (*Gary A. Bornstein* of counsel), for Empire State Pride Agenda and others, amici curiae in the first and second above-entitled actions. I. Whether New York State's same-sex couples may marry is in the first instance a question of New York State law. (*Mansell v Mansell,* 490 US 581; *Moore v Sims,* 442 US 415; *Ex parte Burrus,* 136 US 586; *Lehman v Lycoming County Children's Servs. Agency,* 458 US 502; *United States v Yazell,* 382 US 341; *Minnesota v National Tea Co.,* 309 US 551; *People v Harris,* 77 NY2d 434; *People v Kern,* 75 NY2d 638; *People v Barber,* 289 NY 378; *People v Scott,* 79 NY2d 474.) II. New York State has in many contexts respected relationships of committed same-sex couples. (*Matter of Jacob,* 86 NY2d 651; *DiStefano v DiStefano,* 60 AD2d 976; *Matter of Carolyn B.,* 6 AD3d 67; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *East 10th St. Assoc. v Estate of Goldstein,* 154 AD2d 142; *Levin v Yeshiva Univ.,* 96 NY2d 484; *Slattery v City of New York,* 266 AD2d 24; *Stewart v Schwartz Bros.-Jeffer Mem. Chapel,* 159 Misc 2d 884.)

*Jay Weiser,* New York City, *Lia Brooks, Robert H. Cohen, Allen Drexel, Bruce Wagner,* Albany, *William D. Frumkin,* New York City, and *Mark B. Wheeler,* Ithaca, for Association of the Bar of the City of New York and others, amici curiae in the first and second above-entitled actions. Same-sex couples, who are unable to legally marry in New York, are treated unequally with opposite-sex married couples under New York law. In the absence of equal marriage rights in New York, same-sex couples are unable to fashion alternatives that make up for the unequal rights. (*Matter of Jacob,* 86 NY2d 651; *Matter of Carolyn B.,* 6 AD3d 67; *Matter of Thomas S. v Robin Y.,* 209 AD2d 298; *Matter of Barbara S. v Michael I.,* 24 AD3d 451; *Matter of C.M. v C.H.,* 6 Misc 3d 361; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Matter of Multari v Sorrell,* 287 AD2d 764; *Matter of Gilbert A. v Laura A.,* 261 AD2d 886; *Jean Maby H. v Joseph H.,* 246 AD2d 282; *Anonymous v Anonymous,* 20 AD3d 333.)

*Norman L. Reimer,* New York City, *Ivan J. Dominguez, Kathryn Shreeves, Jean M. Swieca* and *H. Alexander Robinson,* Washington, D.C., for New York County Lawyers' Association and another, amici curiae in the first and second above-entitled actions. Respondents' arguments attempting to circumscribe the fundamental right to marry do not withstand scrutiny. (*Griswold v Connecticut,* 381 US 479; *Planned Parenthood of Southeastern Pa. v Casey,* 505 US 833; *Zablocki v Redhail,* 434 US 374; *People v Onofre,* 51 NY2d 476, 451 US 987; *People v Harris,* 77 NY2d 434; *Meyer v Nebraska,* 262 US 390; *Pierce v*

*Society of Sisters,* 268 US 510; *Turner v Safley,* 482 US 78; *Lawrence v Texas,* 539 US 558; *Matter of Doe v Coughlin,* 71 NY2d 48; *People v Shepard,* 50 NY2d 640.)

*Ropes & Gray LLP,* New York City (*Douglas H. Meal* of counsel), and *Mary L. Bonauto,* Boston, Massachusetts, admitted pro hac vice, for Gay & Lesbian Advocates & Defenders, amicus curiae in the first and second above-entitled actions. Delaying the remedy would be unnecessary and counterproductive if this Court rules in favor of the couples. (*Romer v Evans,* 517 US 620.) II. The Massachusetts cultural and political landscapes increasingly favor marriage equality.

*Simpson Thacher & Bartlett LLP,* New York City (*Joseph F. Tringali, Robert J. Pfister* and *Paul A. Saso* of counsel), for Anti-Defamation League and others, amici curiae in the first and second above-entitled actions. I. The constitutional violation is the denial of the right to marry—not only the denial of the incidents of marriage. (*Fearon v Treanor,* 272 NY 268; *Morris v Morris,* 31 Misc 2d 548; *Haas v Haas,* 271 App Div 107; *Di Lorenzo v Di Lorenzo,* 174 NY 467; *Loving v Virginia,* 388 US 1; *Zablocki v Redhail,* 434 US 374; *Crosby v State of N.Y., Workers' Compensation Bd.,* 57 NY2d 305; *Turner v Safley,* 482 US 78; *United States v Virginia,* 518 US 515; *Olmstead v United States,* 277 US 438.) II. As a matter of remedies, granting civil marriages to same-sex couples is the only measure that can redress the violation of appellants' rights. (*Brown v State of New York,* 89 NY2d 172; *People v LaValle,* 3 NY3d 88; *West Virginia Bd. of Ed. v Barnette,* 319 US 624; *Campaign for Fiscal Equity v State of New York,* 100 NY2d 893; *Matter of Cynthia M. v Elton M.,* 69 Misc 2d 653; *Duncan v Laury,* 249 App Div 314; *Swann v Charlotte-Mecklenburg Bd. of Ed.,* 402 US 1; *Yick Wo v Hopkins,* 118 US 356; *Slattery v City of New York,* 266 AD2d 24; *Sweinhart v Bamberger,* 166 Misc 256.)

*LeBoeuf, Lamb, Greene & MacRae LLP,* New York City (*Vivian L. Polak, Jonathan A. Damon, Paul H. Cohen, Kathryn S. Catenacci, Desiree A. DiCorcia, Angela M. Papalaskaris* and *Colin G. Stewart* of counsel), for Association to Benefit Children and others, amici curiae in the first and second above-entitled actions. I. The institution of marriage provides tangible and material benefits and protections to children who are part of a married family. (*Matter of Jacob,* 86 NY2d 651; *Matter of Landon v Motorola, Inc.,* 38 AD2d 18; *Matter of Mazzeo,* 95 AD2d 91; *Matter of Karin T. v Michael T.,* 127 Misc 2d 14; *Matter of C.M.*

*v C.H.,* 6 Misc 3d 361.) II. Marriage for same-sex couples may benefit children by increasing the durability and stability of their parents' relationship. (*Mirizio v Mirizio,* 242 NY 74; *Diemer v Diemer,* 8 NY2d 206; *Matter of Jacob,* 86 NY2d 651; *Matter of Carolyn B.,* 6 AD3d 67; *Slattery v City of New York,* 179 Misc 2d 740; *Langan v St. Vincent's Hosp. of N.Y.,* 25 AD3d 90; *Matter of Valentine v American Airlines,* 17 AD3d 38; *Lennon v Charney,* 8 Misc 3d 846; *Funderburke v Uniondale Union Free School Dist. No. 15,* 172 Misc 2d 963.) III. The leading experts—child welfare and mental health professionals—agree that lesbian and gay parents are as capable and successful at raising well-adjusted children as are heterosexual parents. IV. Recognizing marriage for same-sex couples would be a logical extension of this Court's decision in *Matter of Jacob* (86 NY2d 651 [1995]).

*Norman J. Chachkin,* New York City, and *Victor A. Bolden* for NAACP Legal Defense and Educational Fund, Inc., amicus curiae in the first and second above-entitled actions. I. The fundamental right to marry extends to same-sex couples. (*Loving v Virginia,* 388 US 1; *Meyer v Nebraska,* 262 US 390; *Zablocki v Redhail,* 434 US 374; *Lawrence v Texas,* 539 US 558; *United States v Virginia,* 518 US 515; *Romer v Evans,* 517 US 620; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Massachusetts Bd. of Retirement v Murgia,* 427 US 307; *Frontiero v Richardson,* 411 US 677.) II. New York's prohibition on marriage for same-sex couples discriminates on the basis of gender. (*Loving v Virginia,* 388 US 1.)

*Suzanne B. Goldberg,* New York City, *Arnold & Porter LLP,* New York City and Washington, D.C. (*Robert C. Mason, Dorothy N. Giobbe, Joshua A. Brook, Jennifer L. Hogan, Helene B. Madonick, Christopher S. Rhee* and *Joshua I. Kaplan* of counsel), and *Costello Cooney & Fearon, PLLC,* Syracuse (*Samuel C. Young* of counsel), for Suzanne B. Goldberg and others, amici curiae in the first and second above-entitled actions. I. The legal definition of marriage in New York has never been static; features of marriage once thought essential have been revisited and rejected consistently over time. (*Bertles v Nunan,* 92 NY 152; *Winter v Winter,* 191 NY 462; *Quilty v Battie,* 135 NY 201; *Bennett v Bennett,* 116 NY 584; *Oppenheim v Kridel,* 236 NY 156; *People v Morton,* 284 App Div 413; *Schultz v Schultz,* 89 NY 644; *Abbe v Abbe,* 22 App Div 483; *Caplan v Caplan,* 268 NY 445; *Allen v Allen,* 246 NY 571.) II. Courts have been at the forefront of invalidating long-standing marriage rules that conflict with constitutional rights. (*Loving v Virginia,* 388 US 1;

*People v Liberta,* 64 NY2d 152; *People v Morton,* 308 NY 96; *Orr v Orr,* 440 US 268; *Childs v Childs,* 69 AD2d 406; *People v Onofre,* 51 NY2d 476; *Matter of Patricia A.,* 31 NY2d 83.) III. Spousal interdependence comprises the essential element of marriage today in New York. Alleged state interests in the sex of marriage partners and in procreation do not justify the exclusion of same-sex couples from marriage. (*Holterman v Holterman,* 3 NY3d 1; *DeLuca v DeLuca,* 97 NY2d 139; *DeJesus v DeJesus,* 90 NY2d 643; *Koehler v Koehler,* 182 Misc 2d 436; *Matter of Lindgren,* 181 Misc 166; *Gleason v Gleason,* 26 NY2d 28; *Halsey v Halsey,* 296 AD2d 28; *Linda R. v Richard E.,* 162 AD2d 48; *Osterhoudt v Osterhoudt,* 28 Misc 285; *Matter of Fountain v Fountain,* 83 AD2d 694.) IV. New York historically has not maintained uniformity with other states in its definition of marriage. (*Matter of May,* 305 NY 486; *Matter of Mott v Duncan Petroleum Trans.,* 51 NY2d 289; *Van Voorhis v Brintnall,* 86 NY 18; *Intercontinental Hotels Corp. [Puerto Rico] v Golden,* 15 NY2d 9; *S.C. v A.C.,* 4 Misc 3d 1014[A], 2004 NY Slip Op 50884.)

*Genant Law Offices,* Mexico (*Robert Genant* of counsel), and *Liberty Counsel,* Lynchburg, Virginia (*Rena M. Lindevaldsen* of counsel), for Concerned Women for America and another, amici curiae in the first and second above-entitled actions. I. The Domestic Relations Law does not violate plaintiffs' equal protection guarantees. (*Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *Matter of Esler v Walters,* 56 NY2d 306; *Romer v Evans,* 517 US 620; *Langan v St. Vincent's Hosp. of N.Y.,* 25 AD3d 90; *Matter of Valentine v American Airlines,* 17 AD3d 38; *Matter of Cooper,* 187 AD2d 128; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Bowen v Gilliard,* 483 US 587; *Holland v Illinois,* 493 US 474; *Lockhart v McCree,* 476 US 162.) II. There is no fundamental right to same-sex marriage. (*Washington v Glucksberg,* 521 US 702; *Skinner v Oklahoma ex rel. Williamson,* 316 US 535; *Maynard v Hill,* 125 US 190; *Loving v Virginia,* 388 US 1; *Zablocki v Redhail,* 434 US 374; *Lawrence v Texas,* 539 US 558; *Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804.)

*Whiteman, Osterman & Hanna LLP,* Albany (*Michael Whiteman, Heather D. Diddel* and *Andrew M. Johnson* of counsel), *Jenner & Block LLP,* Washington, D.C. (*Paul M. Smith, William M. Hohengarten* and *Eric Berger* of counsel), and *Nathalie F.P. Gilfoyle* for American Psychological Association and others, amici curiae in the first and second above-entitled actions. There is no scientific basis for distinguishing between same-sex couples

and heterosexual couples with respect to the legal rights, obligations, benefits and burdens conferred by civil marriage.

*Alliance Defense Fund,* Scottsdale, Arizona (*Byron J. Babione, Benjamin W. Bull, Glen Lavy* and *Christopher R. Stovall* of counsel), for Family Research Council, amicus curiae in the first and second above-entitled actions. I. Constitutional analysis of the marriage laws is incoherent absent recognition of the meaning of "marriage." (*People v Liberta,* 64 NY2d 152, 471 US 1020; *Millington v Southeastern El. Co.,* 22 NY2d 498; *Loving v Virginia,* 388 US 1; *Planned Parenthood of Southeastern Pa. v Casey,* 505 US 833; *Baker v Nelson,* 409 US 810; *Fearon v Treanor,* 272 NY 268, 301 US 667; *Matter of Shields v Madigan,* 5 Misc 3d 901; *Matter of Manhattan Pizza Hut v New York State Human Rights Appeal Bd.,* 51 NY2d 506; *Storrs v Holcomb,* 168 Misc 2d 898; *Washington v Glucksberg,* 521 US 702.) II. Appellants' circular assumptions regarding marriage's meaning and purpose evade their threshold burden under equal protection analysis. (*Langan v St. Vincent's Hosp. of N.Y.,* 25 AD3d 90; *Gruen v County of Suffolk,* 187 AD2d 560; *Margolis v New York City Tr. Auth.,* 157 AD2d 238; *Matter of Cooke v Board of Educ. of Lawrence School Dist.,* 140 AD2d 439; *Matter of Abrams v Bronstein,* 33 NY2d 488; *Affronti v Crosson,* 95 NY2d 713; *Trump v Chu,* 65 NY2d 20; *Maynard v Hill,* 125 US 190; *Meyer v Nebraska,* 262 US 390; *Skinner v Oklahoma ex rel. Williamson,* 316 US 535.) III. The lack of a federal constitutional basis to compel New York to grant marriage to same-sex couples undermines plaintiffs' state constitutional arguments. (*McConnell v Nooner,* 547 F2d 54; *Wilson v Ake,* 354 F Supp 2d 1298; *Adams v Howerton,* 486 F Supp 1119, 673 F2d 1036; *United States v Virginia,* 518 US 515; *Ballard v United States,* 329 US 187.)

*Kindlon and Shanks, P.C.,* Albany (*Terence L. Kindlon* and *Kathy Manley* of counsel), for appellants in the third above-entitled action. I. Because there is a fundamental right to marry, the denial of that right to same-sex couples violates the due process provision of the New York State Constitution. (*People v Shepard,* 50 NY2d 640; *Loving v Virginia,* 388 US 1; *Hope v Perales,* 83 NY2d 563; *Rivers v Katz,* 67 NY2d 485; *People v Onofre,* 51 NY2d 476; *Lawrence v Texas,* 539 US 558; *Matter of Lindgren,* 181 Misc 166; *Bowers v Hardwick,* 478 US 186; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432.) II. Denial of marriage licenses to same-sex couples is a violation of the equal protection guarantee of the New York State Constitution.

(*Brown v State of New York,* 9 AD3d 23; *People v Hansen,* 99 NY2d 339; *People v Scott,* 79 NY2d 474; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *Matter of Jacob,* 86 NY2d 651; *Levin v Yeshiva Univ.,* 96 NY2d 484; *People v Santorelli,* 80 NY2d 875; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Weissman v Evans,* 82 AD2d 441; *Brown v Board of Education,* 347 US 483.) III. Because Domestic Relations Law § 25 provides that couples who undergo the solemnization ceremony without a license are legally married, the Court should hold that appellants, who have done so, are legally married. (*Persad v Balram,* 187 Misc 2d 711; *Amsellem v Amsellem,* 189 Misc 2d 27; *Berenson v Berenson,* 198 Misc 398.)

*John J. Reilly, Corporation Counsel,* Albany (*Patrick K. Jordan* of counsel), for John Marsolais, respondent in the third above-entitled action. I. The Domestic Relations Law should be presumed valid as written by the New York State Legislature in that it does not provide for the issuance of marriage licenses to same-sex couples. (*Rochester Gas & Elec. Corp. v Public Serv. Commn. of State of N.Y.,* 71 NY2d 313; *Matter of Travis S.,* 96 NY2d 818; *People v Foley,* 94 NY2d 668; *Hope v Perales,* 83 NY2d 563; *Matter of Cooper,* 187 AD2d 128; *Anonymous v Anonymous,* 67 Misc 2d 982; *Morris v Morris,* 31 Misc 2d 548; *Hernandez v Robles,* 7 Misc 3d 459; *Maynard v Hill,* 125 US 190; *People v Allen,* 27 NY2d 108.) II. The Domestic Relations Law does not violate any fundamental right and does not violate the Due Process Clause. (*Washington v Glucksberg,* 521 US 702; *Moore v East Cleveland,* 431 US 494; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Matter of Cooper,* 187 AD2d 128; *Loving v Virginia,* 388 US 1; *Skinner v Oklahoma ex rel. Williamson,* 316 US 535; *Zablocki v Redhail,* 434 US 374.) III. The Equal Protection Clause does not provide same-sex couples with a guaranteed right to a marriage license. (*Miller v Johnson,* 515 US 900; *Matter of Klein [Hartnett],* 78 NY2d 662; *Matter of Lloyd v Grella,* 83 NY2d 537; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Matter of Valentine v American Airlines,* 17 AD3d 38; *Dalton v Pataki,* 5 NY3d 243; *Romer v Evans,* 517 US 620; *Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *San Antonio Independent School Dist. v Rodriguez,* 411 US 1; *Matter of Excellus Health Plan v Serio,* 2 NY3d 166.)

*Bixler & Stumbar,* Ithaca (*L. Richard Stumbar* and *Elizabeth J. Bixler* of counsel), and *LoPinto, Schlather, Geldenhuys & Salk* (*Mariette Geldenhuys* and *Diane V. Bruns* of counsel), for

appellants in the fourth above-entitled action. I. Denying same-sex couples the right to marry violates the Due Process Clause of the New York State Constitution. (*Carey v Population Services Int'l,* 431 US 678; *Loving v Virginia,* 388 US 1; *Lawrence v Texas,* 539 US 558; *Arizona v Evans,* 514 US 1; *Cooper v Morin,* 49 NY2d 69; *People v LaValle,* 3 NY3d 88; *Turner v Safley,* 482 US 78; *Boddie v Connecticut,* 401 US 371; *Zablocki v Redhail,* 434 US 374; *Romer v Evans,* 517 US 620.) II. The denial of marriage licenses to same-sex couples by the State of New York is a denial of equal protection of the law because it discriminates on the basis of sexual orientation and on the basis of gender. (*Dorsey v Stuyvesant Town Corp.,* 299 NY 512, 339 US 981; *Seaman v Fedourich,* 16 NY2d 94; *Matter of Esler v Walters,* 56 NY2d 306; *Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *Sharrock v Dell Buick-Cadillac,* 45 NY2d 152; *People ex rel. Arcara v Cloud Books,* 68 NY2d 553; *People v Barber,* 289 NY 378; *People v Liberta,* 64 NY2d 152; *Liberta v Kelly,* 839 F2d 77; *People v Kern,* 75 NY2d 638.) III. It is the role of the Court to overturn unconstitutional legislation. (*People v LaValle,* 3 NY3d 88.)

*Eliot Spitzer, Attorney General,* Albany (*Peter H. Schiff, Andrea Oser* and *Julie M. Sheridan* of counsel), for Attorney General, intervenor in the first above-entitled action, and for New York State Department of Health and another, respondents in the second, third and fourth above-entitled actions. Plaintiffs have not established beyond a reasonable doubt that granting marriage licenses to opposite-sex couples violates the Due Process or Equal Protection clauses of the New York State Constitution. (*Matter of Klein [Hartnett],* 78 NY2d 662, 504 US 912; *Dunlea v Anderson,* 66 NY2d 265; *Montgomery v Daniels,* 38 NY2d 41; *Schulz v State of New York,* 84 NY2d 231, 513 US 1127; *Hope v Perales,* 83 NY2d 563; *Golden v Clark,* 76 NY2d 618; *Washington v Glucksberg,* 521 US 702; *People v Isaacson,* 44 NY2d 511; *Matter of Shields v Madigan,* 5 Misc 3d 901; *Matter of Cooper,* 187 AD2d 128, 82 NY2d 801.)

*Barth, Sullivan & Behr,* Buffalo (*Laurence D. Behr* of counsel), and *Marriage Law Foundation,* Orem, Utah (*Monte N. Stewart* of counsel), for United Families International, amicus curiae in the first, second, third and fourth above-entitled actions. I. Marriage is a vital social institution. (*Williams v North Carolina,* 317 US 287; *People ex rel. Troare v McClelland,* 146 Misc 545; *Lawrence v Texas,* 539 US 558; *Bower Assoc. v Town of Pleasant Val.,* 2 NY3d 617.) II. The courts that have redefined marriage

have elided the social institutional realities of marriage. (*People v Aguilera,* 82 NY2d 23.) III. The other efforts to harmonize genderless marriage with social institutional realities also fail. (*United States v Lopez,* 514 US 549; *Bower Assoc. v Town of Pleasant Val.,* 2 NY3d 617; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432.)

*Shapiro Forman Allen Sava & McPherson LLP,* New York City (*Laurie McPherson* and *Jason Vigna* of counsel), *Alicia Ouellette,* Albany, and *Stephen Clark* for Alicia Ouellette and others, amici curiae in the first, second, third and fourth above-entitled actions. I. Before addressing the constitutional issues presented in this case, the Court should decide whether New York's Domestic Relations Law already permits same-sex couples to marry. (*Braschi v Stahl Assoc. Co.,* 74 NY2d 201; *People v Barber,* 289 NY 378; *Wait v Wait,* 4 NY 95; *Medical Bus. Assoc. v Steiner,* 183 AD2d 86; *Goodell v Goodell,* 77 AD2d 684; *Matter of Rachelle L. v Bruce M.,* 89 AD2d 765; *People v Pickett,* 19 NY2d 170; *Matter of New York Post Corp. v Leibowitz,* 2 NY2d 677; *Edward J. DeBartolo Corp. v Florida Gulf Coast Building & Constr. Trades Council,* 485 US 568; *United States v X-Citement Video, Inc.,* 513 US 64.) II. If New York's Domestic Relations Law denies same-sex couples the right to marry, that denial is unconstitutional. (*Palmore v Sidoti,* 466 US 429; *Caban v Mohammed,* 441 US 380; *Orr v Orr,* 440 US 268; *United States v Virginia,* 518 US 515; *People v Liberta,* 64 NY2d 152; *Los Angeles Dept. of Water & Power v Manhart,* 435 US 702; *Carey v New York State Human Rights Appeal Bd.,* 46 NY2d 1068; *Matter of State Div. of Human Rights v Oneida County Sheriff's Dept.,* 70 NY2d 974; *Loving v Virginia,* 388 US 1; *J. E. B. v Alabama ex rel. T. B.,* 511 US 127.) III. It is the role of this Court to remedy any constitutional defect in New York's marriage statutes. (*Campaign for Fiscal Equity v State of New York,* 100 NY2d 893; *Marbury v Madison,* 1 Cranch [5 US] 137; *People v LaValle,* 3 NY3d 88; *Benson Realty Corp. v Beame,* 50 NY2d 994; *West Virginia Bd. of Ed. v Barnette,* 319 US 624; *Skinner v Oklahoma ex rel. Williamson,* 316 US 535; *Zablocki v Redhail,* 434 US 374; *Raum v Restaurant Assoc.,* 252 AD2d 369; *Greenwald v H & P 29th St. Assoc.,* 241 AD2d 307.) IV. The Court should remedy the constitutional defects by extending New York's marriage statutes to same-sex couples. (*Califano v Westcott,* 443 US 76; *Welsh v United States,* 398 US 333; *Orr v Orr,* 440 US 268; *People v Liberta,* 64 NY2d 152; *Matter of Jessie C.,* 164 AD2d 731; *Childs v Childs,* 69 AD2d 406; *Soto-Lopez v New York City Civ. Serv. Commn.,* 755 F2d 266; *Thaler v Tha-*

*ler,* 89 Misc 2d 315, 58 AD2d 890; *Tuan Anh Nguyen v INS,* 533 US 53.) V. Nothing less than immediate access to civil marriage will suffice to remedy the constitutional defects presented by any exclusion of same-sex couples read into the Domestic Relations Law. (*Sweatt v Painter,* 339 US 629; *Langan v St. Vincent's Hosp.,* 25 AD3d 90; *New Orleans v Dukes,* 427 US 297; *Carey v Piphus,* 435 US 247; *Heckler v Mathews,* 465 US 728; *Lawrence v Texas,* 539 US 558; *Romer v Evans,* 517 US 620; *Plessy v Ferguson,* 163 US 537; *Civil Rights Cases,* 109 US 3; *Watson v Memphis,* 373 US 526.)

*Stephen P. Hayford,* Albany, and *Joshua K. Baker,* Manassas, Virginia, for James Q. Wilson and others, amici curiae in the first, second, third and fourth above-entitled actions. I. Marriage has a unique and indispensable social purpose: creating family unions where children can be known and loved by their own mother and father. (*Matter of Shields v Madigan,* 5 Misc 3d 901; *Laudo v Laudo,* 188 App Div 699; *Landwehr v Barbas,* 241 App Div 769; *Frost v Frost,* 15 Misc 2d 104; *Schumer v Schumer,* 205 Misc 235; *Matter of Cooper,* 149 Misc 2d 282, 187 AD2d 128; *Chavias v Chavias,* 194 App Div 904; *Maher v Maher,* 172 Misc 276; *Lapides v Lapides,* 254 NY 73; *Roger v Roger,* 24 Misc 2d 566.) II. The State of New York's declared interest in marriage is not only legitimate, it is compelling. (*Adams v Howerton,* 486 F Supp 1119, 673 F2d 1036; *People ex rel. Sibley v Sheppard,* 54 NY2d 320.) III. Marriage as the union of husband and wife is rationally related to furthering procreation (including uniting children to their mothers and fathers). IV. Marriage is not gender discrimination.

*Coti & Sugrue,* New York City (*Ralph Coti* of counsel), for Alliance for Marriage, amicus curiae in the first, second, third and fourth above-entitled actions. Social science data confirms the State of New York's interest in defining marriage as the union of one man and one woman to promote the optimal setting for raising children. (*Wilson v Ake,* 354 F Supp 2d 1298; *Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804; *Bowen v Gilliard,* 483 US 587; *Palmore v Sidoti,* 466 US 429; *Stanley v Illinois,* 405 US 645; *Lehr v Robertson,* 463 US 248; *Turner Broadcasting System, Inc. v FCC,* 520 US 180.)

*Debevoise & Plimpton LLP,* New York City (*Kristin D. Kiehn, Eliza M. Sporn, Sally S. Pritchard* and *Jennifer E. Spain* of counsel), for Parents, Families & Friends of Lesbians and Gays, Inc. and others, amici curiae in the first, second, third and

fourth above-entitled actions. I. Courts apply heightened scrutiny to government actions that rely on suspect classifications. (*Heller v Doe,* 509 US 312; *D'Amico v Crosson,* 93 NY2d 29; *Massachusetts Bd. of Retirement v Murgia,* 427 US 307; *United States v Virginia,* 518 US 515; *Alevy v Downstate Med. Ctr. of State of N.Y.,* 39 NY2d 326; *Mathews v Lucas,* 427 US 495; *People v Rambersed,* 170 Misc 2d 923.) II. New York courts may treat sexual orientation as a suspect classification. (*Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344; *Romer v Evans,* 517 US 620; *Bowers v Hardwick,* 478 US 186; *Lofton v Secretary of Dept. of Children & Family Servs.,* 358 F3d 804, 543 US 1081; *Equality Found. of Greater Cincinnati, Inc. v City of Cincinnati,* 128 F3d 289; *Golden v Clark,* 76 NY2d 618; *Oregon v Hass,* 420 US 714; *Board of Educ., Levittown Union Free School Dist. v Nyquist,* 83 AD2d 217, 57 NY2d 27, 459 US 1138; *Brown v State of New York,* 9 AD3d 23; *People v Alvarez,* 70 NY2d 375.) III. The lack of a relationship between sexual orientation and ability justifies application of heightened scrutiny. (*Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *United States v Virginia,* 518 US 515; *J. E. B. v Alabama ex rel. T. B.,* 511 US 127; *Plyler v Doe,* 457 US 202; *Massachusetts Bd. of Retirement v Murgia,* 427 US 307; *Frontiero v Richardson,* 411 US 677; *Watkins v United States Army,* 875 F2d 699; *Matter of Jacob,* 86 NY2d 651; *Braschi v Stahl Assoc. Co.,* 74 NY2d 201.) IV. The history of discrimination against lesbians and gay men requires application of heightened scrutiny. (*Lyng v Castillo,* 477 US 635; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Plyler v Doe,* 457 US 202; *Frontiero v Richardson,* 411 US 677; *Nevada Dept. of Human Resources v Hibbs,* 538 US 721; *Bowen v Gilliard,* 483 US 587; *Lawrence v Texas,* 539 US 558; *Under 21 v City of New York,* 108 AD2d 250, 65 NY2d 344; *Rowland v Mad River Local School Dist.,* 470 US 1009.) V. Although they are neither necessary nor sufficient, additional factors enhance the justification for heightened scrutiny. (*Watkins v United States Army,* 875 F2d 699; *Cleburne v Cleburne Living Center, Inc.,* 473 US 432; *Massachusetts Bd. of Retirement v Murgia,* 427 US 307; *Frontiero v Richardson,* 411 US 677; *Weber v Aetna Casualty & Surety Co.,* 406 US 164; *Nyquist v Mauclet,* 432 US 1; *Parham v Hughes,* 441 US 347; *United States v Virginia,* 518 US 515; *Foley v Connelie,* 435 US 291.) VI. Governmental actions that classify on the basis of sexual orientation warrant heightened scrutiny.

*Ruta & Soulios, LLP,* New York City (*Steven Soulios* of

counsel), for Pastor Gregory L. Wilk and others, amici curiae in the first, second, third and fourth above-entitled actions. I. Changing the definition of marriage would pose serious threats to religious liberty. (*Skinner v Oklahoma ex rel. Williamson,* 316 US 535; *Loving v Virginia,* 388 US 1; *Zablocki v Redhail,* 434 US 374; *Mirizio v Mirizio,* 242 NY 74; *Funderburke v Uniondale Union Free School Dist. No. 15,* 251 AD2d 622, 92 NY2d 813; *Presbytery of N.J. of Orthodox Presbyt. Church v Florio,* 40 F3d 1454; *Bruff v North Mississippi Health Servs., Inc.,* 244 F3d 495; *Levin v Yeshiva Univ.,* 96 NY2d 484; *Bob Jones Univ. v United States,* 461 US 574; *Late Corp. of Church of Jesus Christ of Latter-day Saints v United States,* 136 US 1.) II. The civil and religious components of marriage cannot be segregated. (*Diemer v Diemer,* 6 AD2d 822; *Avitzur v Avitzur,* 58 NY2d 108, 464 US 817; *Maynard v Hill,* 125 US 190; *Brotherhood of Locomotive Firemen & Enginemen v Hogan,* 5 F Supp 598; *United States v Francioso,* 164 F2d 163; *Reynolds v United States,* 98 US 145; *Davis v Beason,* 133 US 333; *Murphy v Ramsey,* 114 US 15; *Caminetti v United States,* 242 US 470; *Turner v Safley,* 482 US 78.)

*Law Offices of Brian W. Raum, P.C.,* New York City (*Brian W. Raum* of counsel), for Dr. Paul McHugh, M.D., and another, amici curiae in the first, second, third and fourth above-entitled actions. I. There is no scientific agreement on the definition of homosexuality. II. Emerging evidence suggests that homosexuality is not an innate characteristic like race or sex.

### OPINION OF THE COURT

R.S. SMITH, J.

We hold that the New York Constitution does not compel recognition of marriages between members of the same sex. Whether such marriages should be recognized is a question to be addressed by the Legislature.

### Facts and Procedural History

Plaintiffs and petitioners (hereafter plaintiffs) are the members of 44 same-sex couples. Each couple tried unsuccessfully to obtain a marriage license. Plaintiffs then began these four lawsuits, seeking declaratory judgments that the restriction of marriage to opposite-sex couples is invalid under the State Constitution. Defendants and respondents (hereafter defendants) are the license-issuing authorities of New York City, Albany and Ithaca; the State Department of Health, which

instructs local authorities about the issuance of marriage licenses; and the State itself. In *Hernandez v Robles*, Supreme Court granted summary judgment in plaintiffs' favor; the Appellate Division reversed. In *Samuels v New York State Department of Health*, *Matter of Kane v Marsolais* and *Seymour v Holcomb*, Supreme Court granted summary judgment in defendants' favor, and the Appellate Division affirmed. We now affirm the orders of the Appellate Division.

## Discussion

### I

All the parties to these cases now acknowledge, implicitly or explicitly, that the Domestic Relations Law limits marriage to opposite-sex couples. Some amici, however, suggest that the statute can be read to permit same-sex marriage, thus mooting the constitutional issues. We find this suggestion untenable.

Articles 2 and 3 of the Domestic Relations Law, which govern marriage, nowhere say in so many words that only people of different sexes may marry each other, but that was the universal understanding when articles 2 and 3 were adopted in 1909, an understanding reflected in several statutes. Domestic Relations Law § 12 provides that "the parties must solemnly declare . . . that they take each other as husband and wife." Domestic Relations Law § 15 (1) (a) requires town and city clerks to obtain specified information from "the groom" and "the bride." Domestic Relations Law § 5 prohibits certain marriages as incestuous, specifying opposite-sex combinations (brother and sister, uncle and niece, aunt and nephew), but not same-sex combinations. Domestic Relations Law § 50 says that the property of "a married woman . . . shall not be subject to her husband's control."

New York's statutory law clearly limits marriage to opposite-sex couples. The more serious question is whether that limitation is consistent with the New York Constitution.

### II

New York is one of many states in which supporters of same-sex marriage have asserted it as a state constitutional right. Several other state courts have decided such cases, under various state constitutional provisions and with divergent results (*e.g.*, *Goodridge v Department of Pub. Health*, 440 Mass 309, 798 NE2d 941 [2003] [excluding same-sex couples from mar-

riage violates Massachusetts Constitution]; *Standhardt v Superior Ct. ex rel. County of Maricopa*, 206 Ariz 276, 77 P3d 451 [Ct App 2004] [constitutional right to marry under Arizona Constitution does not encompass marriage to same-sex partner]; *Morrison v Sadler*, 821 NE2d 15 [Ind 2005] [Indiana Constitution does not require judicial recognition of same-sex marriage]; *Lewis v Harris*, 378 NJ Super 168, 875 A2d 259 [2005] [limitation of marriage to members of opposite sex does not violate New Jersey Constitution]; *Baehr v Lewin*, 74 Haw 530, 852 P2d 44 [1993] [refusal of marriage licenses to couples of the same sex subject to strict scrutiny under Hawaii Constitution]; *Baker v State*, 170 Vt 194, 744 A2d 864 [1999] [denial to same-sex couples of benefits and protections afforded to married people violates Vermont Constitution]). Here, plaintiffs claim that, by limiting marriage to opposite-sex couples, the New York Domestic Relations Law violates two provisions of the State Constitution: the Due Process Clause (art I, § 6 ["No person shall be deprived of life, liberty or property without due process of law"]) and the Equal Protection Clause (art I, § 11 ["No person shall be denied the equal protection of the laws of this state or any subdivision thereof"]).

We approach plaintiffs' claims by first considering, in section III below, whether the challenged limitation can be defended as a rational legislative decision. The answer to this question, as we show in section IV below, is critical at every stage of the due process and equal protection analysis.

### III

It is undisputed that the benefits of marriage are many. The diligence of counsel has identified 316 such benefits in New York law, of which it is enough to summarize some of the most important: Married people receive significant tax advantages, rights in probate and intestacy proceedings, rights to support from their spouses both during the marriage and after it is dissolved, and rights to be treated as family members in obtaining insurance coverage and making health care decisions. Beyond this, they receive the symbolic benefit, or moral satisfaction, of seeing their relationships recognized by the State.

The critical question is whether a rational legislature could decide that these benefits should be given to members of opposite-sex couples, but not same-sex couples. The question is not, we emphasize, whether the Legislature must or should continue to limit marriage in this way; of course the Legislature

may (subject to the effect of the federal Defense of Marriage Act [Pub L 104-199, 110 US Stat 2419]) extend marriage or some or all of its benefits to same-sex couples. We conclude, however, that there are at least two grounds that rationally support the limitation on marriage that the Legislature has enacted. Others have been advanced, but we will discuss only these two, both of which are derived from the undisputed assumption that marriage is important to the welfare of children.

First, the Legislature could rationally decide that, for the welfare of children, it is more important to promote stability, and to avoid instability, in opposite-sex than in same-sex relationships. Heterosexual intercourse has a natural tendency to lead to the birth of children; homosexual intercourse does not. Despite the advances of science, it remains true that the vast majority of children are born as a result of a sexual relationship between a man and a woman, and the Legislature could find that this will continue to be true. The Legislature could also find that such relationships are all too often casual or temporary. It could find that an important function of marriage is to create more stability and permanence in the relationships that cause children to be born. It thus could choose to offer an inducement—in the form of marriage and its attendant benefits—to opposite-sex couples who make a solemn, long-term commitment to each other.

The Legislature could find that this rationale for marriage does not apply with comparable force to same-sex couples. These couples can become parents by adoption, or by artificial insemination or other technological marvels, but they do not become parents as a result of accident or impulse. The Legislature could find that unstable relationships between people of the opposite sex present a greater danger that children will be born into or grow up in unstable homes than is the case with same-sex couples, and thus that promoting stability in opposite-sex relationships will help children more. This is one reason why the Legislature could rationally offer the benefits of marriage to opposite-sex couples only.

There is a second reason: The Legislature could rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father. Intuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like. It is obvious that there are exceptions to this general rule—some children who never know their fathers, or their

mothers, do far better than some who grow up with parents of both sexes—but the Legislature could find that the general rule will usually hold.

Plaintiffs, and amici supporting them, argue that the proposition asserted is simply untrue: that a home with two parents of different sexes has no advantage, from the point of view of raising children, over a home with two parents of the same sex. Perhaps they are right, but the Legislature could rationally think otherwise.

To support their argument, plaintiffs and amici supporting them refer to social science literature reporting studies of same-sex parents and their children. Some opponents of same-sex marriage criticize these studies, but we need not consider the criticism, for the studies on their face do not establish beyond doubt that children fare equally well in same-sex and opposite-sex households. What they show, at most, is that rather limited observation has detected no marked differences. More definitive results could hardly be expected, for until recently few children have been raised in same-sex households, and there has not been enough time to study the long-term results of such child-rearing.

Plaintiffs seem to assume that they have demonstrated the irrationality of the view that opposite-sex marriages offer advantages to children by showing there is no scientific evidence to support it. Even assuming no such evidence exists, this reasoning is flawed. In the absence of conclusive scientific evidence, the Legislature could rationally proceed on the commonsense premise that children will do best with a mother and father in the home. (*See Goodridge*, 440 Mass at 358-359, 798 NE2d at 979-980 [Sosman, J., dissenting].) And a legislature proceeding on that premise could rationally decide to offer a special inducement, the legal recognition of marriage, to encourage the formation of opposite-sex households.

In sum, there are rational grounds on which the Legislature could choose to restrict marriage to couples of opposite sex. Plaintiffs have not persuaded us that this long-accepted restriction is a wholly irrational one, based solely on ignorance and prejudice against homosexuals. This is the question on which these cases turn. If we were convinced that the restriction plaintiffs attack were founded on nothing but prejudice—if we agreed with plaintiffs that it is comparable to the restriction in *Loving v Virginia* (388 US 1 [1967]), a prohibition on inter-

racial marriage that was plainly "designed to maintain White Supremacy" (*id.* at 11)—we would hold it invalid, no matter how long its history. As the dissent points out, a long and shameful history of racism lay behind the kind of statute invalidated in *Loving*.

But the historical background of *Loving* is different from the history underlying this case. Racism has been recognized for centuries—at first by a few people, and later by many more—as a revolting moral evil. This country fought a civil war to eliminate racism's worst manifestation, slavery, and passed three constitutional amendments to eliminate that curse and its vestiges. *Loving* was part of the civil rights revolution of the 1950's and 1960's, the triumph of a cause for which many heroes and many ordinary people had struggled since our nation began.

It is true that there has been serious injustice in the treatment of homosexuals also, a wrong that has been widely recognized only in the relatively recent past, and one our Legislature tried to address when it enacted the Sexual Orientation Non-Discrimination Act four years ago (L 2002, ch 2). But the traditional definition of marriage is not merely a by-product of historical injustice. Its history is of a different kind.

The idea that same-sex marriage is even possible is a relatively new one. Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex. A court should not lightly conclude that everyone who held this belief was irrational, ignorant or bigoted. We do not so conclude.

## IV

Our conclusion that there is a rational basis for limiting marriage to opposite-sex couples leads us to hold that that limitation is valid under the New York Due Process and Equal Protection clauses, and that any expansion of the traditional definition of marriage should come from the Legislature.

This Court is the final authority as to the meaning of the New York Constitution. This does not mean, of course, that we ignore the United States Supreme Court's interpretations of similarly worded clauses of the Federal Constitution. The governing principle is that our Constitution cannot afford less protection to our citizens than the Federal Constitution does, but it can give more (*People v P.J. Video*, 68 NY2d 296, 302

[1986]). We have at times found our Due Process Clause to be more protective of rights than its federal counterpart, usually in cases involving the rights of criminal defendants (*e.g., People v LaValle*, 3 NY3d 88 [2004]) or prisoners (*e.g., Cooper v Morin*, 49 NY2d 69 [1979]). In general, we have used the same analytical framework as the Supreme Court in considering due process cases, though our analysis may lead to different results. By contrast, we have held that our Equal Protection Clause "is no broader in coverage than the Federal provision" (*Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]).

We find no inconsistency that is significant in this case between our due process and equal protection decisions and the Supreme Court's. No precedent answers for us the question we face today; we reject defendants' argument that the Supreme Court's ruling without opinion in *Baker v Nelson* (409 US 810 [1972]) bars us from considering plaintiffs' equal protection claims. But both New York and federal decisions guide us in applying the Due Process and Equal Protection clauses.

A. Due Process

In deciding the validity of legislation under the Due Process Clause, courts first inquire whether the legislation restricts the exercise of a fundamental right, one that is "deeply rooted in this Nation's history and tradition" (*Washington v Glucksberg*, 521 US 702, 721 [1997], quoting *Moore v East Cleveland*, 431 US 494, 503 [1977] [plurality op]; *Hope v Perales*, 83 NY2d 563, 575 [1994]). In this case, whether the right in question is "fundamental" depends on how it is defined. The right to marry is unquestionably a fundamental right (*Loving*, 388 US at 12; *Zablocki v Redhail*, 434 US 374, 384 [1978]; *Cooper*, 49 NY2d at 79). The right to marry someone of the same sex, however, is not "deeply rooted"; it has not even been asserted until relatively recent times. The issue then becomes whether the right to marry must be defined to include a right to same-sex marriage.

Recent Supreme Court decisions show that the definition of a fundamental right for due process purposes may be either too narrow or too broad. In *Lawrence v Texas* (539 US 558, 566 [2003]), the Supreme Court criticized its own prior decision in *Bowers v Hardwick* (478 US 186, 190 [1986]) for defining the right at issue as the right of "homosexuals to engage in sodomy." The *Lawrence* court plainly thought the right should

have been defined more broadly, as a right to privacy in intimate relationships. On the other hand, in *Washington v Glucksberg* (521 US at 722, 723), the Court criticized a lower federal court for defining the right at issue too broadly as a "right to die"; the right at issue in *Glucksberg*, the Court said, was really the "right to commit suicide" and to have assistance in doing so.

The difference between *Lawrence* and *Glucksberg* is that in *Glucksberg* the relatively narrow definition of the right at issue was based on rational line-drawing. In *Lawrence*, by contrast, the court found the distinction between homosexual sodomy and intimate relations generally to be essentially arbitrary. Here, there are, as we have explained, rational grounds for limiting the definition of marriage to opposite-sex couples. This case is therefore, in the relevant way, like *Glucksberg* and not at all like *Lawrence*. Plaintiffs here do not, as the petitioners in *Lawrence* did, seek protection against state intrusion on intimate, private activity. They seek from the courts access to a state-conferred benefit that the Legislature has rationally limited to opposite-sex couples. We conclude that, by defining marriage as it has, the New York Legislature has not restricted the exercise of a fundamental right (*see also* concurring op of Judge Graffeo at 368-374).

Where no fundamental right is at issue, legislation is valid under the Due Process Clause if it is rationally related to legitimate government interests (*Glucksberg*, 521 US at 728; *Hope*, 83 NY2d at 577). Again, our earlier discussion answers this question. Protecting the welfare of children is a legitimate governmental interest, and we have shown above that there is a rational relationship between that interest and the limitation of marriage to opposite-sex couples. That limitation therefore does not deprive plaintiffs of due process of law.

B. Equal Protection

Plaintiffs claim that the distinction made by the Domestic Relations Law between opposite-sex and same-sex couples deprives them of the equal protection of the laws. This claim raises, first, the issue of what level of scrutiny should be applied to the legislative classification. The plaintiffs argue for strict scrutiny, on the ground that the legislation affects their fundamental right to marry (*see Alevy v Downstate Med. Ctr. of State of N.Y.*, 39 NY2d 326, 332 [1976])—a contention we rejected above. Alternatively, plaintiffs argue for so-called intermediate or heightened scrutiny on two grounds. They say that the legisla-

tion discriminates on the basis of sex, a kind of discrimination that has been held to trigger heightened scrutiny (*e.g.*, *United States v Virginia*, 518 US 515, 532-533 [1996]). They also say that discrimination on the basis of sexual preference should trigger heightened scrutiny, a possibility we left open in *Under 21, Catholic Home Bur. for Dependent Children v City of New York* (65 NY2d at 364). We reject both of these arguments, and hold that the restriction of marriage to opposite-sex couples is subject only to rational basis scrutiny.

By limiting marriage to opposite-sex couples, New York is not engaging in sex discrimination. The limitation does not put men and women in different classes, and give one class a benefit not given to the other. Women and men are treated alike—they are permitted to marry people of the opposite sex, but not people of their own sex. This is not the kind of sham equality that the Supreme Court confronted in *Loving*; the statute there, prohibiting black and white people from marrying each other, was in substance anti-black legislation. Plaintiffs do not argue here that the legislation they challenge is designed to subordinate either men to women or women to men as a class.

However, the legislation does confer advantages on the basis of sexual preference. Those who prefer relationships with people of the opposite sex and those who prefer relationships with people of the same sex are not treated alike, since only opposite-sex relationships may gain the status and benefits associated with marriage. This case thus presents the question of what level of scrutiny is to be applied to legislation that classifies people on this basis. We held in *Under 21* that "classifications based on sexual orientation" would not be subject to strict scrutiny, but left open the question of "whether some level of 'heightened scrutiny' would be applied" in such cases (*id.* at 364).

We resolve this question in this case on the basis of the Supreme Court's observation that no more than rational basis scrutiny is generally appropriate "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement" (*Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 441 [1985]). Perhaps that principle would lead us to apply heightened scrutiny to sexual preference discrimination in some cases, but not where we review legislation governing marriage and family relationships. A person's preference for the sort of sexual activity that cannot lead to the birth of children is relevant to the

State's interest in fostering relationships that will serve children best. In this area, therefore, we conclude that rational basis scrutiny is appropriate.

Where rational basis scrutiny applies, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest" (*id.* at 440). Plaintiffs argue that a classification distinguishing between opposite-sex couples and same-sex couples cannot pass rational basis scrutiny, because if the relevant state interest is the protection of children, the category of those permitted to marry—opposite-sex couples—is both underinclusive and overinclusive. We disagree.

Plaintiffs argue that the category is underinclusive because, as we recognized above, same-sex couples, as well as opposite-sex couples, may have children. That is indeed a reason why the Legislature might rationally choose to extend marriage or its benefits to same-sex couples; but it could also, for the reasons we have explained, rationally make another choice, based on the different characteristics of opposite-sex and same-sex relationships. Our earlier discussion demonstrates that the definition of marriage to include only opposite-sex couples is not irrationally underinclusive.

In arguing that the definition is overinclusive, plaintiffs point out that many opposite-sex couples cannot have or do not want to have children. How can it be rational, they ask, to permit these couples, but not same-sex couples, to marry? The question is not a difficult one to answer. While same-sex couples and opposite-sex couples are easily distinguished, limiting marriage to opposite-sex couples likely to have children would require grossly intrusive inquiries, and arbitrary and unreliable line-drawing. A legislature that regarded marriage primarily or solely as an institution for the benefit of children could rationally find that an attempt to exclude childless opposite-sex couples from the institution would be a very bad idea.

Rational basis scrutiny is highly indulgent towards the State's classifications (*see Heller v Doe,* 509 US 312, 320-321 [1993]). Indeed, it is "a paradigm of judicial restraint" (*Affronti v Crosson,* 95 NY2d 713, 719 [2001], *cert denied sub nom. Affronti v Lippman,* 534 US 826 [2001]). We conclude that permitting marriage by all opposite-sex couples does not create an irrationally overnarrow or overbroad classification. The distinction between opposite-sex and same-sex couples enacted by the Legislature does not violate the Equal Protection Clause.

## V

We hold, in sum, that the Domestic Relations Law's limitation of marriage to opposite-sex couples is not unconstitutional. We emphasize once again that we are deciding only this constitutional question. It is not for us to say whether same-sex marriage is right or wrong. We have presented some (though not all) of the arguments against same-sex marriage because our duty to defer to the Legislature requires us to do so. We do not imply that there are no persuasive arguments on the other side—and we know, of course, that there are very powerful emotions on both sides of the question.

The dissenters assert confidently that "future generations" will agree with their view of this case (dissenting op at 396). We do not predict what people will think generations from now, but we believe the present generation should have a chance to decide the issue through its elected representatives. We therefore express our hope that the participants in the controversy over same-sex marriage will address their arguments to the Legislature; that the Legislature will listen and decide as wisely as it can; and that those unhappy with the result—as many undoubtedly will be—will respect it as people in a democratic state should respect choices democratically made.

Accordingly, the orders of the Appellate Division in each case should be affirmed without costs.

GRAFFEO, J. (concurring). We are asked by the 44 same-sex couples who commenced these four cases to declare that the denial of marriage licenses to same-sex couples violates the Due Process and Equal Protection clauses of the New York Constitution. Plaintiffs and petitioners (collectively referred to as plaintiffs) are representative of many homosexual couples living in committed relationships in our state, some of whom are raising children. They seek the societal recognition and legal and financial benefits accorded by the State to legally married couples. Respondents are the State of New York, the State Department of Health and local officials from the cities of New York, Albany and Ithaca who are involved either in overseeing the New York marriage licensing process or issuing marriage licenses.

Plaintiffs assert that the restriction of marriage to opposite-sex couples impedes the fundamental right to marry and amounts to gender or sexual orientation discrimination that does not withstand any level of constitutional analysis, whether

strict scrutiny, intermediate scrutiny or rational basis review. Because the determination of the proper level of constitutional review is crucial to the judicial resolution of the issues in this case, I write separately to elaborate on the standard of review that should be applied under the precedent of this Court and the United States Supreme Court. I conclude that rational basis analysis is appropriate and, applying this standard, I concur in the result reached by the plurality that an affirmance is warranted in each of these cases.

This Court has long recognized that "[f]rom time immemorial the State has exercised the fullest control over the marriage relation," going so far as to observe that "[t]here are, in effect, three parties to every marriage, the man, the woman and the State" (*Fearon v Treanor*, 272 NY 268, 272 [1936], *appeal dismissed* 301 US 667 [1937]). The historical conception of marriage as a union between a man and a woman is reflected in the civil institution of marriage adopted by the New York Legislature. The cases before us present no occasion for this Court to debate whether the State Legislature should, as a matter of social welfare or sound public policy, extend marriage to same-sex couples. Our role is limited to assessing whether the current statutory scheme offends the Due Process or Equal Protection clauses of the New York Constitution. Because it does not, we must affirm. Absent a constitutional violation, we may not disturb duly enacted statutes to, in effect, substitute another policy preference for that of the Legislature.

The Statutory Scheme:

As a preliminary matter, although plaintiffs have abandoned the argument (raised in Supreme Court in both *Kane* and *Seymour*) that the Domestic Relations Law already authorizes same-sex marriage because it does not explicitly define marriage as a union between one man and one woman, several amici continue to suggest that this Court can avoid a constitutional analysis by simply interpreting the statutory scheme to allow same-sex marriage. Our role when construing a statute is to ascertain and implement the will of the Legislature unless we are prevented from doing so by constitutional infirmity. It would be inappropriate for us to interpret the Domestic Relations Law in a manner that virtually all concede would not comport with legislative intent.

There is no basis to conclude that, when the Legislature adopted the Domestic Relations Law more than a century ago, it contemplated the possibility of same-sex marriage,

much less intended to authorize it. In fact, the Domestic Relations Law contains many references to married persons that demonstrate that the Legislature viewed marriage as a union between one woman and one man—as seen by references to the parties to a marriage as the "bride" and "groom" (Domestic Relations Law § 15 [1] [a]) and "wife" and "husband" (Domestic Relations Law §§ 6, 12, 221, 248; *see also* CPLR 4502 [b]). Notably, high courts of other states with statutory schemes comparable to New York's have interpreted the pertinent statutes as not authorizing same-sex marriage (*see Goodridge v Department of Pub. Health*, 440 Mass 309, 798 NE2d 941 [2003]; *Baker v Nelson*, 291 Minn 310, 191 NW2d 185 [1971], *appeal dismissed* 409 US 810 [1972]). And several of our prior cases alluded to the fact that the Domestic Relations Law precludes same-sex couples from marrying (*Levin v Yeshiva Univ.*, 96 NY2d 484, 494 [2001]; *Braschi v Stahl Assoc. Co.*, 74 NY2d 201, 210 [1989]). Because the Domestic Relations Law does not authorize marriage between persons of the same sex, this Court must address plaintiffs' constitutional challenges to the validity of the marriage scheme, which are at the heart of this litigation.

Due Process:

Plaintiffs argue that the Domestic Relations Law violates article I, § 6 of the New York Constitution, which provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Their substantive due process challenge is predicated on the assertion that the New York Constitution precludes the State from defining marriage as a union between one man and one woman because the right to privacy derived therein grants each individual the unqualified right to select and marry the person of his or her choice. If the Due Process Clause encompasses this right, and if it is one of the bundle of rights deemed "fundamental" as plaintiffs contend, the Domestic Relations Law would be subjected to the most demanding form of constitutional review, with the State having the burden to prove that it is narrowly tailored to serve compelling state interests.

But it is an inescapable fact that New York due process cases and the relevant federal case law cited therein do not support plaintiffs' argument. While many US Supreme Court decisions recognize marriage as a fundamental right protected under the Due Process Clause, all of these cases understood the marriage

right as involving a union of one woman and one man (*see e.g.* *Turner v Safley*, 482 US 78 [1987]; *Zablocki v Redhail*, 434 US 374 [1978]; *Griswold v Connecticut*, 381 US 479 [1965]; *Skinner v Oklahoma ex rel. Williamson*, 316 US 535 [1942]). Whether interpreting New York's Due Process Clause or its federal counterpart (which is textually identical), when this Court has addressed the fundamental right to marry, it has relied on federal precedent and similarly used the word "marriage" in its traditional sense. For example, in *Cooper v Morin*, we grounded the right of pretrial detainees to have contact visits with family on the "fundamental right to marriage and family life . . . and to bear and rear children" (49 NY2d 69, 80 [1979], *cert denied sub nom. Lombard v Cooper*, 446 US 984 [1980]), citing US Supreme Court cases highlighting the link between marriage and procreation. As the Third Department aptly noted in *Samuels*, to ignore the meaning ascribed to the right to marry in these cases and substitute another meaning in its place is to redefine the right in question and to tear the resulting new right away from the very roots that caused the US Supreme Court and this Court to recognize marriage as a fundamental right in the first place.

Nor has this Court recognized a due process right to privacy distinct from that articulated by the US Supreme Court. Although our Court has interpreted the New York Due Process Clause more broadly than its federal counterpart on a few occasions, all of those cases involved the rights of criminal defendants, prisoners or pretrial detainees, or other confined individuals and implicated classic liberty concerns beyond the right to privacy. Most recently, in *People v LaValle* (3 NY3d 88 [2004]), the Court concluded that the anticipatory deadlock charge in the Death Penalty Act violated New York's Due Process Clause, even though it may have been upheld under the United States Constitution. Likewise, in *Cooper* (49 NY2d 69 [1979]), we held that the New York Due Process Clause protected the right of pretrial detainees in a county jail to have nonconjugal contact visits with family members, even though no such right had been deemed protected under the federal Due Process Clause. Even then, our analysis did not turn on recognition of broader family privacy rights than those articulated by the Supreme Court. Rather, the analysis focused on rejection of the rational basis test that the Supreme Court then applied to

assess jail regulations,[1] with this Court instead adopting a test that "balanc[ed] . . . the harm to the individual resulting from the condition imposed against the benefit sought by the government through its enforcement" (*id.* at 79).

Most of our Due Process Clause decisions in the right to privacy realm have cited federal authority interchangeably with New York precedent, making no distinction between New York's constitutional provision and the federal Due Process Clause (*see e.g. Hope v Perales*, 83 NY2d 563, 575 [1994]; *Matter of Raquel Marie X.*, 76 NY2d 387 [1990], *cert denied sub nom. Robert C. v Miguel T.*, 498 US 984 [1990]; *Matter of Doe v Coughlin*, 71 NY2d 48 [1987], *cert denied* 488 US 879 [1988]; *Rivers v Katz*, 67 NY2d 485 [1986]). Our Court has not recognized a fundamental right to marry that departs in any respect from the right defined by the US Supreme Court in cases like *Skinner* which acknowledged that marriage is "fundamental to the very existence and survival of the [human] race" because it is the primary institution supporting procreation and child-rearing (316 US at 541; *see also Zablocki*, 434 US 374; *Griswold*, 381 US 479). The binary nature of marriage—its inclusion of one woman and one man—reflects the biological fact that human procreation cannot be accomplished without the genetic contribution of both a male and a female. Marriage creates a supportive environment for procreation to occur and the resulting offspring to be nurtured. Although plaintiffs suggest that the connection between procreation and marriage has become anachronistic because of scientific advances in assisted reproduction technology, the fact remains that the vast majority of children are conceived naturally through sexual contact between a woman and a man.

Plaintiffs' reliance on *Loving v Virginia* (388 US 1 [1967]) for the proposition that the US Supreme Court has established a fundamental "right to marry the spouse of one's choice" outside the male/female construct is misplaced. In *Loving*, an interracial couple argued that Virginia's antimiscegenation statute, which precluded "any white person in this State to marry any save a white person, or a person with no other admixture of

---

1. Eight years after *Cooper* was decided, the US Supreme Court strengthened the federal test for assessing the efficacy of prison regulations that implicate fundamental rights, requiring the state to show that the restriction is reasonably related to a legitimate security or penological interest and is not an "exaggerated response" to such interests (*see Turner v Safley*, 482 US 78, 90 [1987]).

blood than white and American Indian" (*id*. at 5 n 4), violated the federal Due Process and Equal Protection clauses. The statute made intermarriage in violation of its terms a felony carrying a potential jail sentence of one to five years. The Lovings—a white man and a black woman—had married in violation of the law and been convicted, prompting them to challenge the validity of the Virginia law.

The Supreme Court struck the statute on both equal protection and due process grounds, but the focus of the analysis was on the Equal Protection Clause. Noting that "[t]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States," the Court applied strict scrutiny review to the racial classification, finding "no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification" (*id*. at 10, 11). It made clear "that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause" (*id*. at 12). There is no question that the Court viewed this antimiscegenation statute as an affront to the very purpose for the adoption of the Fourteenth Amendment—to combat invidious racial discrimination.

In its brief due process analysis, the Supreme Court reiterated that marriage is a right "fundamental to our very existence and survival" (*id*., citing *Skinner*, 316 US at 541)—a clear reference to the link between marriage and procreation. It reasoned: "To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes . . . is surely to deprive all the State's citizens of liberty without due process of law" (*id*.). Although the Court characterized the right to marry as a "choice," it did not articulate the broad "right to marry the spouse of one's choice" suggested by plaintiffs here. Rather, the Court observed that "[t]he Fourteenth Amendment requires that *the freedom of choice to marry not be restricted by invidious racial discriminations*" (*id*. [emphasis added]).[2] Needless to say, a statutory scheme that burdens a fundamental right by making conduct criminal based on the race of the individual who engages in it is inimical to the

**2.** Plaintiffs cite *Crosby v State of N.Y., Workers' Compensation Bd.* (57 NY2d 305, 312 [1982]) and *People v Shepard* (50 NY2d 640, 644 [1980]) for the proposition that the right to marry encompasses the unqualified right to marry the spouse of one's choice. But, in resolving controversies unrelated to the right to marry, those cases did not analyze the fundamental marriage

values embodied in the state and federal Due Process clauses. Far from recognizing a right to marry extending beyond the one woman and one man union,[3] it is evident from the *Loving* decision that the Supreme Court viewed marriage as fundamental precisely because of its relationship to human procreation.[4]

Nor does the Supreme Court's recent federal due process analysis in *Lawrence v Texas* (539 US 558 [2003]) support defining the fundamental marriage right in the manner urged by

right but merely cited *Loving* when including marriage in a list of rights that have received constitutional protection.

**3.** Of course, the rights and responsibilities attendant marriage have changed over time and there have always been differences between the states concerning the legal incidents of marriage, including differing age restrictions, consanguinity provisions and, unfortunately, some states—although not New York—once had antimiscegenation laws. With the exception of the recent extension of marriage to same-sex couples by the Supreme Judicial Court of Massachusetts (*see Opinions of the Justices to the Senate*, 440 Mass 1201, 802 NE2d 565 [2004], clarifying *Goodridge*, 440 Mass 309, 798 NE2d 941), the one element common to the institution across the nation and despite the passage of time has been its definition as a union between one man and one woman. This is how marriage is defined in the federal Defense of Marriage Act (Pub L 104-199, 110 US Stat 2419; *see* 1 USC § 7), which provides that no state "shall be required to give effect to any public act, record, or judicial proceeding of any other State . . . respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State" (28 USC § 1738C).

**4.** Four years after *Loving*, the Minnesota Supreme Court upheld Minnesota's marriage laws in the face of a challenge brought by same-sex couples (*Baker v Nelson*, 291 Minn 310, 191 NW2d 185 [1971], *appeal dismissed* 409 US 810 [1972]). The court rejected the argument that the federal Due Process Clause encompassed a right to marry that extended to same-sex couples, noting that in *Loving* and its other privacy cases the US Supreme Court had recognized that "[t]he institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis" (291 Minn at 312, 191 NW2d at 186). The US Supreme Court summarily dismissed the appeal "for want of a substantial federal question" (409 US 810 [1972]). Under Supreme Court decisional law, as far as lower courts are concerned, "summary dismissals are . . . to be taken as rulings on the merits . . . in the sense that they rejected the specific challenges presented in the statement of jurisdiction and left undisturbed the judgment appealed from" (*Washington v Confederated Bands & Tribes of Yakima Nation*, 439 US 463, 477 n 20 [1979] [internal quotation marks and citation omitted]) and "lower courts are bound by summary decisions . . . until such time as the [Supreme] Court informs (them) that (they) are not" (*Hicks v Miranda*, 422 US 332, 344-345 [1975] [internal quotation marks omitted]). Thus, with respect to the federal Due Process Clause, we must presume that *Loving* did not expand the fundamental right to marry in the manner suggested by plaintiffs in the cases before us. This observation does not, however, preclude this Court from interpreting the New York State Due Process Clause more expansively.

plaintiffs. In *Lawrence*, the Court overruled its prior decision in *Bowers v Hardwick* (478 US 186 [1986]) and struck as unconstitutional a Texas statute that criminalized consensual sodomy between adult individuals of the same sex. The holding in *Lawrence* is consistent with our Court's decision in *People v Onofre* (51 NY2d 476 [1980], *cert denied* 451 US 987 [1981]), which invalidated under a federal due process analysis a New York Penal Law provision that criminalized consensual sodomy between nonmarried persons.

In *Lawrence* the Supreme Court did not create any new fundamental rights, nor did it employ a strict scrutiny analysis. It acknowledged that laws that criminalize sexual conduct between homosexuals

> "have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals" (539 US at 567).

Criticizing the historical analysis in *Bowers*, it noted that, even though sodomy as well as other nonprocreative sexual activity had been proscribed, criminal statutes "directed at homosexual conduct as a distinct matter" (*id*. at 568) were of recent vintage, having developed in the last third of the 20th century, and therefore did not possess "ancient roots" (*id*. at 570).

Consistent with our analysis in *Onofre*, the *Lawrence* court held "that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons" (*id*. at 567) because "liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex" (*id*. at 572). It reasoned that "moral disapproval"—the only justification Texas proffered for its law—is never an adequate basis for a criminal statute, a conclusion similar to this Court's observation in *Onofre* that "it is not the function of the Penal Law in our governmental policy to provide either a medium for the articulation or the apparatus for the intended enforcement of moral or theological values" (51 NY2d at 488 n 3). Thus, in striking the sodomy law, the Supreme Court found that "[t]he Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual" (*Lawrence*, 539 US at 578).

The right affirmed by the Supreme Court in *Lawrence* is not comparable to the new right to marry plaintiffs assert here, nor is the Texas statute criminalizing homosexual sodomy analogous to the marriage statutes under review. The Domestic Relations Law is not a penal provision and New York has not attempted to regulate plaintiffs' private sexual conduct or disturb the sanctity of their homes. And, in contrast to the Texas statute, New York's marriage laws are part of a longstanding tradition with roots dating back long before the adoption of our State Constitution.

New York's Due Process Clause simply does not encompass a fundamental right to marry the spouse of one's choice outside the one woman/one man construct. Strict scrutiny review of the Domestic Relations Law is therefore not warranted and, insofar as due process analysis is concerned, the statutory scheme must be upheld unless plaintiffs prove that it is not rationally related to any legitimate state interest.

Equal Protection:

Plaintiffs contend that, even if strict scrutiny analysis is not appropriate under the Due Process Clause, a heightened standard of review is nonetheless mandated under the Equal Protection Clause because New York's marriage laws create gender and sexual orientation classifications that require a more rigorous level of analysis than rational basis review.

The Equal Protection Clause, added to the New York Constitution in 1938, provides:

> "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state" (NY Const, art I, § 11).

Soon after the adoption of this provision, this Court recognized that it was modeled after its federal counterpart and "embodies" the federal equal protection command (*Dorsey v Stuyvesant Town Corp.*, 299 NY 512, 530 [1949], *cert denied* 339 US 981 [1950]; *see also, Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985] ["the State constitutional equal protection clause . . . is no broader in coverage than the Federal provision"]). Accordingly, this Court has consistently cited federal cases and applied federal

analysis to resolve equal protection claims brought under the federal and state constitutions (*see e.g. Matter of Aliessa v Novello*, 96 NY2d 418 [2001]; *People v Liberta*, 64 NY2d 152 [1984], *cert denied* 471 US 1020 [1985]).

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" (*Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 439 [1985]). Both the US Supreme Court and this Court have applied three levels of review to legislative classifications. "[W]hen a statute classifies by race, alienage, or national origin" (*id.* at 440), or when it burdens a fundamental right protected under the Due Process Clause, it is subjected to strict scrutiny meaning that it will be sustained only if it is narrowly tailored to serve a compelling state interest (*see Golden v Clark*, 76 NY2d 618, 623 [1990]). Classifications based on gender or illegitimacy are reviewed under an intermediate level of scrutiny—meaning they will be sustained if "substantially related to the achievement of an important governmental objective" (*Liberta*, 64 NY2d at 168; *Clark v Jeter*, 486 US 456 [1988]). Neither the Supreme Court nor this Court has recognized any other classifications as triggering heightened scrutiny and, therefore, all other statutory distinctions have been sustained if rationally related to a legitimate government interest (*see e.g. Golden*, 76 NY2d 618).

Plaintiffs argue that the Domestic Relations Law creates a classification based on gender that requires intermediate scrutiny because a woman cannot marry another woman due to her gender and a man cannot marry another man due to his gender. Respondents counter that the marriage laws are neutral insofar as gender is concerned because they treat all males and females equally—neither gender can marry a person of the same sex and both can marry persons of the opposite sex.

Respondents' interpretation more closely comports with the analytical framework for gender discrimination applied by this Court and the Supreme Court. The precedent establishes that gender discrimination occurs when men and women are not treated equally and one gender is benefitted or burdened as opposed to the other. For example, in *Liberta* (64 NY2d 152), we held that the Penal Law's restriction of the crime of forcible rape to male offenders constituted gender discrimination and the restriction was struck on the basis that it failed to meet the intermediate scrutiny standard. Men and women were not treated equally because only men could be convicted of forcible rape; women who engaged in precisely the same conduct could

not be charged or convicted of the same offense. Similarly, in *Mississippi Univ. for Women v Hogan* (458 US 718 [1982]), the Supreme Court found that a publically-funded state university that refused to allow men admission to its nursing program had engaged in gender discrimination. The university improperly privileged female students by allowing them a benefit not available to similarly-situated male applicants. Likewise, in *J. E. B. v Alabama ex rel. T. B.* (511 US 127 [1994]), a prosecutor was determined to have engaged in gender discrimination when he exercised 9 of his 10 peremptory challenges to strike males from the venire panel resulting in an all-female jury. There, the prosecutor did not apply jury selection criteria equally among males and females—he used almost all of his challenges to exclude men from the jury.

Plaintiffs cite *Loving* for the proposition that a statute can discriminate even if it treats both classes identically. This misconstrues the *Loving* analysis because the antimiscegenation statute did not treat blacks and whites identically—it restricted who whites could marry (but did not restrict intermarriage between non-whites) for the purpose of promoting white supremacy. Virginia's antimiscegenation statute was the quintessential example of invidious racial discrimination as it was intended to advantage one race and disadvantage all others, which is why the Supreme Court applied strict scrutiny and struck it down as violating the core interest of the Equal Protection Clause.

In contrast, neither men nor women are disproportionately disadvantaged or burdened by the fact that New York's Domestic Relations Law allows only opposite-sex couples to marry—both genders are treated precisely the same way. As such, there is no gender classification triggering intermediate scrutiny.

Nor does the statutory scheme create a classification based on sexual orientation. In this respect, the Domestic Relations Law is facially neutral: individuals who seek marriage licenses are not queried concerning their sexual orientation and are not precluded from marrying if they are not heterosexual. Regardless of sexual orientation, any person can marry a person of the opposite sex. Certainly, the marriage laws create a classification that distinguishes between opposite-sex and same-sex couples and this has a disparate impact on gays and lesbians. However, a claim that a facially-neutral statute enacted without an invidious discriminatory intent has a disparate impact on a class (even a suspect class, such as one defined by race) is insufficient

to establish an equal protection violation[5] (*see Campaign for Fiscal Equity v State of New York*, 86 NY2d 307, 321 [1995]; *People v New York City Tr. Auth.*, 59 NY2d 343, 350 [1983]; *Washington v Davis*, 426 US 229, 240 [1976]). Plaintiffs concede that the Domestic Relations Law was not enacted with an invidiously discriminatory intent—the Legislature did not craft the marriage laws for the purpose of disadvantaging gays and lesbians (*cf. Romer v Evans*, 517 US 620 [1996]). Hence, there is no basis to address plaintiffs' argument that classifications based on sexual orientation should be subjected to intermediate scrutiny.

Rational Basis Review:

Thus, under both the Due Process and Equal Protection clauses, these cases turn on whether the Legislature's decision to confine the institution of marriage to couples composed of one woman and one man is rationally related to any legitimate state interest. In *Affronti v Crosson* (95 NY2d 713, 719 [2001], *cert denied sub nom. Affronti v Lippman,* 534 US 826 [2001]), we explained that

> "[t]he rational basis standard of review is a paradigm of judicial restraint. On rational basis review, a statute will be upheld unless the disparate treatment is so unrelated to the achievement of any combination of legitimate purposes that it is irrational. Since the challenged statute is presumed to be valid, the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it . . . whether or not the basis has a foundation in the record. Thus, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." (Internal quotation marks, citations, brackets and emphasis omitted.)

Especially in the realm of social or economic legislation, "the Equal Protection Clause allows the States wide latitude . . . and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes"

---

5. Such disparate impact claims are usually brought under civil rights statutes that authorize them, such as the New York City Human Rights Law (*see e.g. Levin v Yeshiva Univ.*, 96 NY2d 484 [2001]).

(*Cleburne*, 473 US at 440; *see generally Lovelace v Gross*, 80 NY2d 419, 427 [1992]).

In these cases, respondents articulate a number of interests that they claim are legitimate and are advanced by the current definition of marriage. Given the extremely deferential standard of review, plaintiffs cannot prevail unless they establish that no conceivable legitimate interest is served by the statutory scheme. This means that if this Court finds a rational connection between the classification and any single governmental concern, the marriage laws survive review under both the Due Process and Equal Protection clauses.

As set forth in the plurality opinion, plaintiffs have failed to negate respondents' explanation that the current definition of marriage is rationally related to the State's legitimate interest in channeling opposite-sex relationships into marriage because of the natural propensity of sexual contact between opposite-sex couples to result in pregnancy and childbirth. Of course, marriage can and does serve individual interests that extend well beyond creating an environment conducive to procreation and child-rearing, such as companionship and emotional fulfilment. But here we are concerned with the State's interest in promoting the institution of marriage.

As Justice Robert Cordy pointed out in his dissent in *Goodridge v Department of Pub. Health* (440 Mass at 381-382, 798 NE2d at 995 [Cordy, J., dissenting]):

> "Civil marriage is the institutional mechanism by which societies have sanctioned and recognized particular family structures, and the institution of marriage has existed as one of the fundamental organizing principles of human society. . . . Paramount among its many important functions, the institution of marriage has systematically provided for the regulation of heterosexual behavior, brought order to the resulting procreation, and ensured a stable family structure in which children will be reared, educated, and socialized. . . . [A]n orderly society requires some mechanism for coping with the fact that sexual intercourse [between a man and a woman] commonly results in pregnancy and childbirth. The institution of marriage is that mechanism."

Since marriage was instituted to address the fact that sexual contact between a man and a woman naturally can result in

pregnancy and childbirth, the Legislature's decision to focus on opposite-sex couples is understandable. It is not irrational for the Legislature to provide an incentive for opposite-sex couples—for whom children may be conceived from casual, even momentary intimate relationships—to marry, create a family environment, and support their children. Although many same-sex couples share these family objectives and are competently raising children in a stable environment, they are simply not similarly situated to opposite-sex couples in this regard given the intrinsic differences in the assisted reproduction or adoption processes that most homosexual couples rely on to have children.

As respondents concede, the marriage classification is imperfect and could be viewed in some respects as overinclusive or underinclusive since not all opposite-sex couples procreate, opposite-sex couples who cannot procreate may marry, and opposite-sex partners can and do procreate outside of marriage. It is also true that children being raised in same-sex households would derive economic and social benefits if their parents could marry. But under rational basis review, the classification need not be perfectly precise or narrowly tailored—all that is required is a reasonable connection between the classification and the interest at issue. In light of the history and purpose of the institution of marriage, the marriage classification in the Domestic Relations Law meets that test.

The Legislature has granted the benefits (and responsibilities) of marriage to the class—opposite-sex couples—that it concluded most required the privileges and burdens the institution entails due to inherent procreative capabilities. This type of determination is a central legislative function and lawmakers are afforded leeway in fulfilling this function, especially with respect to economic and social legislation where issues are often addressed incrementally (see FCC v Beach Communications, Inc., 508 US 307, 315-316 [1993]). It may well be that the time has come for the Legislature to address the needs of same-sex couples and their families, and to consider granting these individuals additional benefits through marriage or whatever status the Legislature deems appropriate. Because the New York Constitution does not compel such a revision of the Domestic Relations Law, the decision whether or not to do so rests with our elected representatives.

Chief Judge KAYE (dissenting). Plaintiffs (including petitioners) are 44 same-sex couples who wish to marry. They include a doctor, a police officer, a public school teacher, a nurse, an artist and a state legislator. Ranging in age from under 30 to 68, plaintiffs reflect a diversity of races, religions and ethnicities. They come from upstate and down, from rural, urban and suburban settings. Many have been together in committed relationships for decades, and many are raising children—from toddlers to teenagers. Many are active in their communities, serving on their local school board, for example, or their cooperative apartment building board. In short, plaintiffs represent a cross-section of New Yorkers who want only to live full lives, raise their children, better their communities and be good neighbors.

For most of us, leading a full life includes establishing a family. Indeed, most New Yorkers can look back on, or forward to, their wedding as among the most significant events of their lives. They, like plaintiffs, grew up hoping to find that one person with whom they would share their future, eager to express their mutual lifetime pledge through civil marriage. Solely because of their sexual orientation, however—that is, because of who they love—plaintiffs are denied the rights and responsibilities of civil marriage. This State has a proud tradition of affording equal rights to all New Yorkers. Sadly, the Court today retreats from that proud tradition.

## I. Due Process

Under both the state and federal constitutions, the right to due process of law protects certain fundamental liberty interests, including the right to marry. Central to the right to marry is the right to marry the person of one's choice (*see e.g. Crosby v State of N.Y., Workers' Compensation Bd.*, 57 NY2d 305, 312 [1982] ["clearly falling within (the right of privacy) are matters relating to the decision of whom one will marry"]; *People v Shepard*, 50 NY2d 640, 644 [1980] ["the government has been prevented from interfering with an individual's decision about whom to marry"]). The deprivation of a fundamental right is subject to strict scrutiny and requires that the infringement be narrowly tailored to achieve a compelling state interest (*see e.g. Carey v Population Services Int'l*, 431 US 678, 686 [1977]).

Fundamental rights are those "which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed" (*Washington v*

*Glucksberg*, 521 US 702, 720-721 [1997] [internal quotation marks and citations omitted]). Again and again, the Supreme Court and this Court have made clear that the right to marry is fundamental (*see e.g. Loving v Virginia*, 388 US 1 [1967]; *Zablocki v Redhail*, 434 US 374 [1978]; *Turner v Safley*, 482 US 78 [1987]; *Matter of Doe v Coughlin*, 71 NY2d 48, 52 [1987]; *Cooper v Morin*, 49 NY2d 69, 80 [1979]; *Levin v Yeshiva Univ.*, 96 NY2d 484, 500 [2001] [G.B. Smith, J., concurring] ["marriage is a fundamental constitutional right"]).

The Court concludes, however, that same-sex marriage is not deeply rooted in tradition, and thus cannot implicate any fundamental liberty. But fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights. Indeed, in recasting plaintiffs' invocation of their fundamental right to marry as a request for recognition of a "new" right to same-sex marriage, the Court misapprehends the nature of the liberty interest at stake. In *Lawrence v Texas* (539 US 558 [2003]), the Supreme Court warned against such error.

*Lawrence* overruled *Bowers v Hardwick* (478 US 186 [1986]), which had upheld a Georgia statute criminalizing sodomy. In so doing, the *Lawrence* court criticized *Bowers* for framing the issue presented too narrowly. Declaring that "*Bowers* was not correct when it was decided, and it is not correct today" (539 US at 578), *Lawrence* explained that *Bowers* purported to analyze—erroneously—whether the Constitution conferred a "fundamental right upon homosexuals to engage in sodomy" (539 US at 566 [citation omitted]). This was, however, the wrong question. The fundamental right at issue, properly framed, was the right to engage in private consensual sexual conduct—a right that applied to both homosexuals and heterosexuals alike. In narrowing the claimed liberty interest to embody the very exclusion being challenged, *Bowers* "disclose[d] the Court's own failure to appreciate the extent of the liberty at stake" (*Lawrence*, 539 US at 567).

The same failure is evident here. An asserted liberty interest is not to be characterized so narrowly as to make inevitable the conclusion that the claimed right could not be fundamental because historically it has been denied to those who now seek to exercise it (*see Planned Parenthood of Southeastern Pa. v Casey*, 505 US 833, 847 [1992] [it is "tempting . . . to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government

interference by other rules of law when the Fourteenth Amendment was ratified. . . . But such a view would be inconsistent with our law"]).

Notably, the result in *Lawrence* was not affected by the fact, acknowledged by the Court, that there had been no long history of tolerance for homosexuality. Rather, in holding that "[p]ersons in a homosexual relationship may seek autonomy for the[ ] purpose[ of making intimate and personal choices], just as heterosexual persons do" (539 US at 574), *Lawrence* rejected the notion that fundamental rights it had already identified could be restricted based on traditional assumptions about who should be permitted their protection. As the Court noted, "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom" (*Lawrence*, 539 US at 579; *see also id.* at 572 ["(h)istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry" (internal quotation marks and citation omitted)]; *Cleburne v Cleburne Living Center, Inc.*, 473 US 432, 466 [1985] [Marshall, J., concurring in the judgment in part and dissenting in part] ["what once was a 'natural' and 'self-evident' ordering later comes to be seen as an artificial and invidious constraint on human potential and freedom"]).

Simply put, fundamental rights are fundamental rights. They are not defined in terms of who is entitled to exercise them.

Instead, the Supreme Court has repeatedly held that the fundamental right to marry must be afforded even to those who have previously been excluded from its scope—that is, to those whose *exclusion* from the right was "deeply rooted."[1] Well into the twentieth century, the sheer weight of precedent accepting the constitutionality of bans on interracial marriage was deemed sufficient justification in and of itself to perpetuate these discriminatory laws (*see e.g. Jones v Lorenzen*, 441 P2d 986, 989

---

**1.** In other contexts, this Court has also recognized that due process rights must be afforded to all, even as against a history of exclusion of one group or another from past exercise of these rights (*see e.g. Matter of Raquel Marie X.*, 76 NY2d 387, 397 [1990] [affording the right to custody of one's children to unwed fathers, despite a long history of excluding unwed fathers from that right]; *Rivers v Katz*, 67 NY2d 485, 495-496 [1986] [affording the right to refuse medical treatment to the mentally disabled, despite a long history of excluding the mentally ill from that right]).

[Okla 1965] [upholding antimiscegenation law since the "great weight of authority holds such statutes constitutional"])—much as defendants now contend that same-sex couples should be prohibited from marrying because historically they always have been.

Just 10 years before *Loving* declared unconstitutional state laws banning marriage between persons of different races, 96% of Americans were opposed to interracial marriage (*see* brief of NAACP Legal Defense and Educational Fund, Inc., as amicus curiae in support of plaintiffs, at 5). Sadly, many of the arguments then raised in support of the antimiscegenation laws were identical to those made today in opposition to same-sex marriage (*see e.g. Kinney v Commonwealth*, 71 Va [30 Gratt] 858, 869 [1878] [marriage between the races is "unnatural" and a violation of God's will]; *Pace v State*, 69 Ala 231, 232 [1881] ["amalgamation" of the races would produce a "degraded civilization"]; *see also Lonas v State*, 50 Tenn [3 Heisk] 287, 310 [1871] ["(t)he laws of civilization demand that the races be kept apart"]).

To those who appealed to history as a basis for prohibiting interracial marriage, it was simply inconceivable that the right of interracial couples to marry could be deemed "fundamental." Incredible as it may seem today, during the lifetime of every Judge on this Court, interracial marriage was forbidden in at least a third of American jurisdictions. In 1948, New York was one of only 18 states in the nation that did not have such a ban. By 1967, when *Loving* was decided, 16 states still outlawed marriages between persons of different races. Nevertheless, even though it was the *ban* on interracial marriage—not interracial marriage itself—that had a long and shameful national tradition, the Supreme Court determined that interracial couples could not be deprived of their fundamental right to marry.

Unconstitutional infringements on the right to marry are not limited to impermissible racial restrictions. Inasmuch as the fundamental right to marry is shared by "all the State's citizens" (*Loving*, 388 US at 12), the State may not, for example, require individuals with child support obligations to obtain court approval before getting married (*see Zablocki*, 434 US 374 [1978]). Calling *Loving* the "leading decision of this Court on the right to marry," Justice Marshall made clear in *Zablocki* that *Loving*

"could have rested solely on the ground that the

statutes discriminated on the basis of race in violation of the Equal Protection Clause. But the Court went on to hold that laws arbitrarily deprived the couple of a fundamental liberty protected by the Due Process Clause, the freedom to marry. . . .

"Although *Loving* arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals" (434 US at 383-384 [citation omitted]).

Similarly, in *Turner* (482 US 78 [1987]), the Supreme Court determined that the right to marry was so fundamental that it could not be denied to prison inmates (*see also Boddie v Connecticut*, 401 US 371 [1971] [state requirement that indigent individuals pay court fees to obtain divorce unconstitutionally burdened fundamental right to marry]).

Under our Constitution, discriminatory views about proper marriage partners can no more prevent same-sex couples from marrying than they could different-race couples. Nor can "deeply rooted" prejudices uphold the infringement of a fundamental right (*see People v Onofre*, 51 NY2d 476, 490 [1980] ["disapproval by a majority of the populace . . . may not substitute for the required demonstration of a valid basis for intrusion by the State in an area of important personal decision"]). For these reasons, the NAACP Legal Defense and Educational Fund, as amicus, contends that

"[a]lthough the historical experiences in this country of African Americans, on the one hand, and gay men and lesbians, on the other, are in many important ways quite different, the legal questions raised here and in *Loving* are analogous. The state law at issue here, like the law struck down in *Loving*, restricts an individual's right to marry the person of his or her choice. We respectfully submit that the decisions below must be reversed if this Court follows the reasoning of the United States Supreme Court's decision in *Loving*" (brief of NAACP Legal Defense and Educational Fund, Inc., as amicus curiae in support of plaintiffs, at 3-4; *see also* brief of New York County Lawyers' Association and National Black Justice Coalition, as amici curiae in support of plaintiffs [detailing history of antimiscegenation laws and public attitudes toward interracial marriage]).

It is no answer that same-sex couples can be excluded from marriage because "marriage," by definition, does not include them. In the end, "an argument that marriage is heterosexual because it 'just is' amounts to circular reasoning" (*Halpern v Attorney Gen. of Can.*, 65 OR3d 161, 172 OAC 276, ¶ 71 [2003]). "To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question we are asked to decide" (*Goodridge v Department of Pub. Health*, 440 Mass 309, 348, 798 NE2d 941, 972-973 [2003] [Greaney, J., concurring]).

The claim that marriage has always had a single and unalterable meaning is a plain distortion of history. In truth, the common understanding of "marriage" has changed dramatically over the centuries (*see* brief of Professors of History and Family Law, as amici curiae in support of plaintiffs). Until well into the nineteenth century, for example, marriage was defined by the doctrine of coverture, according to which the wife's legal identity was merged into that of her husband, whose property she became. A married woman, by definition, could not own property and could not enter into contracts.[2] Such was the very "meaning" of marriage. Only since the mid-twentieth century has the institution of marriage come to be understood as a relationship between two equal partners, founded upon shared intimacy and mutual financial and emotional support. Indeed, as amici professors note, "The historical record shows that, through adjudication and legislation, all of New York's sex-specific rules for marriage have been invalidated save for the one at issue here."

That restrictions on same-sex marriage are prevalent cannot in itself justify their retention. After all, widespread public opposition to interracial marriage in the years before *Loving* could not sustain the antimiscegenation laws. "[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice" (*Lawrence*, 539 US at 577-578 [internal quotation marks and citation omitted]; *see also id.* at 571 [fundamental right to engage in private consensual sexual conduct extends to homosexuals, notwithstanding that "for centuries there have been powerful voices to condemn homo-

---

**2.** Moreover, until as recently as 1984, a husband could not be prosecuted for raping his wife (*see People v Liberta*, 64 NY2d 152 [1984]).

sexual conduct as immoral"]). The long duration of a constitutional wrong cannot justify its perpetuation, no matter how strongly tradition or public sentiment might support it.

## II. Equal Protection

By virtue of their being denied entry into civil marriage, plaintiff couples are deprived of a number of statutory benefits and protections extended to married couples under New York law. Unlike married spouses, same-sex partners may be denied hospital visitation of their critically ill life partners. They must spend more of their joint income to obtain equivalent levels of health care coverage. They may, upon the death of their partners, find themselves at risk of losing the family home. The record is replete with examples of the hundreds of ways in which committed same-sex couples and their children are deprived of equal benefits under New York law. Same-sex families are, among other things, denied equal treatment with respect to intestacy, inheritance, tenancy by the entirety, taxes, insurance, health benefits, medical decisionmaking, workers' compensation, the right to sue for wrongful death and spousal privilege. Each of these statutory inequities, as well as the discriminatory exclusion of same-sex couples from the benefits and protections of civil marriage as a whole, violates their constitutional right to equal protection of the laws.

Correctly framed, the question before us is not whether the marriage statutes properly benefit those they are intended to benefit—any discriminatory classification does that—but whether there exists any legitimate basis for *excluding* those who are not covered by the law. That the language of the licensing statute does not expressly reference the implicit exclusion of same-sex couples is of no moment (*see* Domestic Relations Law § 13 ["persons intended to be married" must obtain a marriage license]). The Court has, properly, construed the statutory scheme as prohibiting same-sex marriage. That being so, the statute, in practical effect, becomes identical to—and, for purposes of equal protection analysis, must be analyzed as if it were—one explicitly providing that "civil marriage is hereby established for couples consisting of a man and a woman," or, synonymously, "marriage between persons of the same sex is prohibited."

On three independent grounds, this discriminatory classification is subject to heightened scrutiny, a test that defendants concede it cannot pass.

## A. Heightened Scrutiny

### 1. Sexual Orientation Discrimination

Homosexuals meet the constitutional definition of a suspect class, that is, a group whose defining characteristic is "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others" (*Cleburne*, 473 US at 440). Accordingly, any classification discriminating on the basis of sexual orientation must be narrowly tailored to meet a compelling state interest (*see e.g. Alevy v Downstate Med. Ctr. of State of N.Y.*, 39 NY2d 326, 332 [1976]; *Matter of Aliessa v Novello*, 96 NY2d 418, 431 [2001]).

"No single talisman can define those groups likely to be the target of classifications offensive to the Fourteenth Amendment and therefore warranting heightened or strict scrutiny" (*Cleburne*, 473 US at 472 n 24 [Marshall, J., concurring in the judgment in part and dissenting in part]). Rather, such scrutiny is to be applied when analyzing legislative classifications involving groups who "may well be the target of the sort of prejudiced, thoughtless, or stereotyped action that offends principles of equality found in" the Constitution (*id.* at 472).

Although no single factor is dispositive, the Supreme Court has generally looked to three criteria in determining whether a group subject to legislative classification must be considered "suspect." First, the Court has considered whether the group has historically been subjected to purposeful discrimination. Homosexuals plainly have been, as the Legislature expressly found when it recently enacted the Sexual Orientation Non-Discrimination Act (SONDA), barring discrimination against homosexuals in employment, housing, public accommodations, education, credit and the exercise of civil rights. Specifically, the Legislature found

> "that many residents of this state have encountered prejudice on account of their sexual orientation, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering. The legislature further recognizes that this prejudice has fostered a general climate of hostility and distrust, leading in some instances to

physical violence against those perceived to be homosexual or bisexual" (L 2002, ch 2, § 1; *see also* brief of Parents, Families & Friends of Lesbians and Gays, Inc., et al., as amici curiae in support of plaintiffs, at 22-49 [detailing history of state-sanctioned discrimination against gays and lesbians]).

Second, the Court has considered whether the trait used to define the class is unrelated to the ability to perform and participate in society. When the State differentiates among its citizens "on the basis of stereotyped characteristics not truly indicative of their abilities" (*Massachusetts Bd. of Retirement v Murgia*, 427 US 307, 313 [1976]), the legislative classification must be closely scrutinized. Obviously, sexual orientation is irrelevant to one's ability to perform or contribute.

Third, the Court has taken into account the group's relative political powerlessness. Defendants contend that classifications based on sexual orientation should not be afforded heightened scrutiny because, they claim, homosexuals are sufficiently able to achieve protection from discrimination through the political process, as evidenced by the Legislature's passage of SONDA in 2002. SONDA, however, was first introduced in 1971. It failed repeatedly for 31 years, until it was finally enacted just four years ago. Further, during the Senate debate on the Hate Crimes Act of 2000, one Senator noted that "[i]t's no secret that for years we could have passed a hate-crimes bill if we were willing to take out gay people, if we were willing to take out sexual orientation" (New York State Senate Debate on Senate Bill S 4691-A, June 7, 2000, at 4609 [statement of Senator Schneiderman]; *accord id.* at 4548-4549 [statement of Senator Connor]). The simple fact is that New York has not enacted anything approaching comprehensive statewide domestic partnership protections for same-sex couples, much less marriage or even civil unions.

In any event, the Supreme Court has never suggested that racial or sexual classifications are not (or are no longer) subject to heightened scrutiny because of the passage of even comprehensive civil rights laws (*see Cleburne*, 473 US at 467 [Marshall, J., concurring in the judgment in part and dissenting in part]). Indeed, sex discrimination was first held to deserve heightened scrutiny in 1973—*after* passage of title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963, federal laws prohibiting sex discrimination. Such measures acknowledge—rather

than mark the end of—a history of purposeful discrimination (*see Frontiero v Richardson*, 411 US 677, 687-688 [1973] [citing antidiscrimination legislation to support conclusion that classifications based on sex merit heightened scrutiny]).

Nor is plaintiffs' claim legitimately answered by the argument that the licensing statute does not discriminate on the basis of sexual orientation since it permits homosexuals to marry persons of the opposite sex and forbids heterosexuals to marry persons of the same sex. The purported "right" of gays and lesbians to enter into marriages with different-sex partners to whom they have no innate attraction cannot possibly cure the constitutional violation actually at issue here. "The right to marry is the right of individuals, not of . . . groups" (*Perez v Sharp*, 32 Cal 2d 711, 716, 198 P2d 17, 20 [1948]). "Human beings are bereft of worth and dignity by a doctrine that would make them as interchangeable as trains" (32 Cal 2d at 725, 198 P2d at 25). Limiting marriage to opposite-sex couples undeniably restricts gays and lesbians from marrying their chosen same-sex partners whom "to [them] may be irreplaceable" (*id.*)—and thus constitutes discrimination based on sexual orientation.[3]

## 2. Sex Discrimination

The exclusion of same-sex couples from civil marriage also discriminates on the basis of sex, which provides a further basis for requiring heightened scrutiny. Classifications based on sex must be substantially related to the achievement of important governmental objectives (*see e.g. Craig v Boren*, 429 US 190, 197 [1976]), and must have an "exceedingly persuasive justification" (*Mississippi Univ. for Women v Hogan*, 458 US 718, 724 [1982] [citations omitted]).

Under the Domestic Relations Law, a woman who seeks to marry another woman is prevented from doing so on account of her sex—that is, because she is not a man. If she were, she would be given a marriage license to marry that woman. That

---

**3.** Indeed, the true nature and extent of the discrimination suffered by gays and lesbians in this regard is perhaps best illustrated by the simple truth that each one of the plaintiffs here could lawfully enter into a marriage of convenience with a complete stranger of the opposite sex tomorrow, and thereby immediately obtain all of the myriad benefits and protections incident to marriage. Plaintiffs are, however, denied these rights because they each desire instead to marry the person they love and with whom they have created their family.

the statutory scheme applies equally to both sexes does not alter the conclusion that the classification here is based on sex. The "equal application" approach to equal protection analysis was expressly rejected by the Supreme Court in *Loving*: "[W]e reject the notion that the mere 'equal application' of a statute containing [discriminatory] classifications is enough to remove the classifications from the [constitutional] proscription of all invidious . . . discriminations" (388 US at 8). Instead, the *Loving* court held that "[t]here can be no question but that Virginia's miscegenation statutes rest solely upon distinctions drawn according to race [where the] statutes proscribe generally accepted conduct if engaged in by members of different races" (*id.* at 11; *see also Johnson v California*, 543 US 499, 506 [2005]; *McLaughlin v Florida*, 379 US 184, 191 [1964]; *Anderson v Martin*, 375 US 399, 403-404 [1964]; *Shelley v Kraemer*, 334 US 1, 21-22 [1948]; *J. E. B. v Alabama ex rel. T. B.*, 511 US 127, 141-142 [1994] [government exercise of peremptory challenges on the basis of gender constitutes impermissible sex discrimination even though based on gender stereotyping of both men and women]).

### 3. Fundamental Right

"Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests" (*Lawrence*, 539 US at 575). Because, as already discussed, the legislative classification here infringes on the exercise of the fundamental right to marry, the classification cannot be upheld unless it is necessary to the achievement of a compelling state interest (*see Onofre*, 51 NY2d at 492 n 6; *Alevy*, 39 NY2d at 332; *Eisenstadt v Baird*, 405 US 438, 447 n 7 [1972]). "[C]ritical examination of the state interests advanced in support of the classification is required" (*Zablocki*, 434 US at 383 [internal quotation marks and citations omitted]). And if "the means selected by the State for achieving" even "legitimate and substantial interests" unnecessarily impinge on the right to marry, the statutory distinction "cannot be sustained" (*id.* at 388).

### B. Rational-Basis Analysis

Although the classification challenged here should be analyzed using heightened scrutiny, it does not satisfy even rational-basis review, which requires that the classification "rationally further

a legitimate state interest" (*Affronti v Crosson*, 95 NY2d 713, 718 [2001], *cert denied sub nom. Affronti v Lippman*, 534 US 826 [2001]). Rational-basis review requires *both* the existence of a legitimate interest *and* that the classification rationally advance that interest. Although a number of interests have been proffered in support of the challenged classification at issue, none is rationally furthered by the exclusion of same-sex couples from marriage. Some fail even to meet the threshold test of legitimacy.

Properly analyzed, equal protection requires that it be the legislated *distinction* that furthers a legitimate state interest, not the discriminatory law itself (*see e.g. Cooper*, 49 NY2d at 78; *Romer v Evans*, 517 US 620, 633 [1996]). Were it otherwise, an irrational or invidious exclusion of a particular group would be permitted so long as there was an identifiable group that benefitted from the challenged legislation. In other words, it is not enough that the State have a legitimate interest in recognizing or supporting opposite-sex marriages. The relevant question here is whether there exists a rational basis for *excluding* same-sex couples from marriage, and, in fact, whether the State's interests in recognizing or supporting opposite-sex marriages are rationally *furthered* by the exclusion.

## 1. Children

Defendants primarily assert an interest in encouraging procreation within marriage. But while encouraging opposite-sex couples to marry before they have children is certainly a legitimate interest of the State, the *exclusion* of gay men and lesbians from marriage in no way furthers this interest. There are enough marriage licenses to go around for everyone.

Nor does this exclusion rationally further the State's legitimate interest in encouraging heterosexual married couples to procreate. Plainly, the ability or desire to procreate is not a prerequisite for marriage. The elderly are permitted to marry, and many same-sex couples do indeed have children. Thus, the statutory classification here—which prohibits only same-sex couples, and no one else, from marrying—is so grossly underinclusive and overinclusive as to make the asserted rationale in promoting procreation "impossible to credit" (*Romer*, 517 US at 635).[4] Indeed, even the *Lawrence* dissenters observed that "encouragement of procreation" could not "possibly" be a justification

---

4. Although the plurality asserts that the Legislature could not possibly exclude from marriage opposite-sex couples unable to have children because to

for denying marriage to gay and lesbian couples, "since the sterile and the elderly are allowed to marry" (539 US at 605 [Scalia, J., dissenting]; *see also Lapides v Lapides*, 254 NY 73, 80 [1930] ["inability to bear children" does not justify an annulment under the Domestic Relations Law]).

Of course, there are many ways in which the government could rationally promote procreation—for example, by giving tax breaks to couples who have children, subsidizing child care for those couples, or mandating generous family leave for parents. Any of these benefits—and many more—might convince people who would not otherwise have children to do so. But no one rationally decides to have children because gays and lesbians are excluded from marriage.

In holding that prison inmates have a fundamental right to marry—even though they cannot procreate—the Supreme Court has made it clear that procreation is not the sine qua non of marriage. "Many important attributes of marriage remain . . . after taking into account the limitations imposed by prison life. . . . [I]nmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship" (*Turner*, 482 US at 95-96). Nor is there any conceivable rational basis for allowing prison inmates to marry, but not homosexuals. It is, of course, no answer that inmates could potentially procreate once they are released—that is, once they are no longer prisoners—since, as nonprisoners, they would then undeniably have a right to marry even in the absence of *Turner*.

Marriage is about much more than producing children, yet same-sex couples are excluded from the entire spectrum of protections that come with civil marriage—purportedly to encourage other people to procreate. Indeed, the protections that the State gives to couples who do marry—such as the right to own property as a unit or to make medical decisions for each other—are focused largely on the adult relationship, rather than on the couple's possible role as parents. Nor does the

do so would require "grossly intrusive inquiries" (plurality op at 365), no explanation is given as to why the Legislature could not easily remedy the irrationality inherent in allowing all childless couples to marry—if, as the plurality believes, the sole purpose of marriage is procreation—by simply barring from civil marriage all couples in which both spouses are older than, say, 55. In that event, the State would have no need to undertake intrusive inquiries of any kind.

plurality even attempt to explain how offering only heterosexuals the right to visit a sick loved one in the hospital, for example, conceivably furthers the State's interest in encouraging opposite-sex couples to have children, or indeed how excluding same-sex couples from each of the specific legal benefits of civil marriage—even apart from the totality of marriage itself—does not independently violate plaintiffs' rights to equal protection of the laws. The breadth of protections that the marriage laws make unavailable to gays and lesbians is "so far removed" from the State's asserted goal of promoting procreation that the justification is, again, "impossible to credit" (*Romer*, 517 US at 635).

The State plainly has a legitimate interest in the welfare of children, but excluding same-sex couples from marriage in no way furthers this interest. In fact, it undermines it. Civil marriage provides tangible legal protections and economic benefits to married couples and their children, and tens of thousands of children are currently being raised by same-sex couples in New York. Depriving these children of the benefits and protections available to the children of opposite-sex couples is antithetical to their welfare, as defendants do not dispute (*see e.g. Baker v State*, 170 Vt 194, 219, 744 A2d 864, 882 [1999] ["(i)f anything, the exclusion of same-sex couples from the legal protections incident to marriage exposes *their* children to the precise risks that the State argues the marriage laws are designed to secure against"]; *cf. Matter of Jacob*, 86 NY2d 651, 656 [1995] ["(t)o rule otherwise would mean that the thousands of New York children actually being raised in homes headed by two unmarried persons could have only one legal parent, not the two who want them"]). The State's interest in a stable society is rationally advanced when families are established and remain intact irrespective of the gender of the spouses.

Nor may the State legitimately seek either to promote heterosexual parents over homosexual parents, as the plurality posits, or to discourage same-sex parenting. First, granting such a preference to heterosexuals would be an acknowledgment of purposeful discrimination against homosexuals, thus constituting a flagrant equal protection violation. Second, such a preference would be contrary to the stated public policy of New York, and therefore irrational (*see* 18 NYCRR 421.16 [h] [2] [applicants to be adoptive parents "shall not be rejected solely on the basis of homosexuality"]; *see also Jacob*, 86 NY2d at 668 [same-sex partner of a legal parent may adopt that parent's

child; "(a)ny proffered justification for rejecting (adoptions) based on a governmental policy disapproving of homosexuality or encouraging marriage would not apply"]; brief of American Psychological Association et al., as amici curiae in support of plaintiffs, at 34-43 [collecting the results of social scientific research studies which conclude that children raised by same-sex parents fare no differently from, and do as well as, those raised by opposite-sex parents in terms of the quality of the parent-child relationship and the mental health, development and social adjustment of the child]; brief of Association to Benefit Children et al., as amici curiae in support of plaintiffs, at 31-35 [same conclusion]).[5]

## 2. Moral Disapproval

The government cannot legitimately justify discrimination against one group of persons as a mere desire to preference another group (*see Metropolitan Life Ins. Co. v Ward*, 470 US 869, 882 and n 10 [1985]). Further, the Supreme Court has held that classifications "drawn for the purpose of disadvantaging the group burdened by the law" can never be legitimate (*Romer*, 517 US at 633), and that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest" (*Department of Agriculture v Moreno*, 413 US 528, 534 [1973]; *see also Onofre*, 51 NY2d at 490 ["disapproval by a majority of the populace . . . may not substitute for the required demonstration of a valid basis for intrusion by the State in an area of important personal decision"]; *Palmore v Sidoti*, 466 US 429, 433 [1984] ["(p)rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect"]; *Lawrence*, 539 US at 571 [no legitimate basis to penalize gay and lesbian relationships notwithstanding that "for centuries there have been powerful voices to condemn homosexual conduct as immoral"]; *id.* at 583 [O'Connor, J., concurring in the judgment] ["(m)oral disapproval" of homosexuals cannot be a legitimate state interest]).

---

**5.** Nor could the State have a legitimate interest in privileging some children over others depending on the manner in which they were conceived or whether or not their parents were married (*see Jacob*, 86 NY2d at 667 [depriving children of legal relationship with de facto parents "based solely on their biological mother's sexual orientation or marital status . . . raise(s) constitutional concerns"]; *Levy v Louisiana*, 391 US 68, 71 [1968] [child born out of wedlock may not be denied rights enjoyed by other citizens]).

### 3. Tradition

That civil marriage has traditionally excluded same-sex couples—i.e., that the "historic and cultural understanding of marriage" has been between a man and a woman—cannot in itself provide a rational basis for the challenged exclusion. To say that discrimination is "traditional" is to say only that the discrimination has existed for a long time. A classification, however, cannot be maintained merely "for its own sake" (*Romer*, 517 US at 635). Instead, the classification (here, the exclusion of gay men and lesbians from civil marriage) must advance a state interest that is separate from the classification itself (*see Romer*, 517 US at 633, 635). Because the "tradition" of excluding gay men and lesbians from civil marriage is no different from the classification itself, the exclusion cannot be justified on the basis of "history." Indeed, the justification of "tradition" does not explain the classification; it merely repeats it. Simply put, a history or tradition of discrimination—no matter how entrenched—does not make the discrimination constitutional (*see also Goodridge*, 440 Mass at 332 n 23, 798 NE2d at 961 n 23 ["it is circular reasoning, not analysis, to maintain that marriage must remain a heterosexual institution because that is what it historically has been"]).[6]

### 4. Uniformity

The State asserts an interest in maintaining uniformity with the marriage laws of other states. But our marriage laws *currently* are not uniform with those of other states. For example, New York—unlike most other states in the nation—permits first cousins to marry (*see* Domestic Relations Law § 5). This disparity has caused no trouble, however, because well-settled principles of comity resolve any conflicts. The same well-settled principles of comity would resolve any conflicts arising from any disparity involving the recognition of same-sex marriages.

It is, additionally, already impossible to maintain uniformity among all the states, inasmuch as Massachusetts has now legalized same-sex marriage. Indeed, of the seven jurisdictions that border New York State, only Pennsylvania cur-

---

**6.** Ultimately, as the *Lawrence* dissenters recognized, " 'preserving the traditional institution of marriage' is just a kinder way of describing the State's *moral disapproval* of same-sex couples" (539 US at 601 [Scalia, J., dissenting]), an illegitimate basis for depriving gay and lesbian couples of the equal protection of the laws.

rently affords no legal status to same-sex relationships. Massachusetts, Ontario and Quebec all authorize same-sex marriage; Vermont and Connecticut provide for civil unions (*see* Vt Stat Ann, tit 15, § 1204 [a]; Conn Gen Stat § 46b-38nn); and New Jersey has a statewide domestic partnership law (*see* NJ Stat Ann § 26:8A-1 *et seq.*). Moreover, insofar as a number of localities within New York offer domestic partnership registration, even the law within the state is not uniform. Finally, and most fundamentally, to justify the exclusion of gay men and lesbians from civil marriage because "others do it too" is no more a justification for the discriminatory classification than the contention that the discrimination is rational because it has existed for a long time. As history has well taught us, separate is inherently unequal.

## III. The Legislature

The Court ultimately concludes that the issue of same-sex marriage should be addressed by the Legislature. If the Legislature were to amend the statutory scheme by making it gender neutral, obviously the instant controversy would disappear. But this Court cannot avoid its obligation to remedy constitutional violations in the hope that the Legislature might some day render the question presented academic. After all, by the time the Court decided *Loving* in 1967, many states had already repealed their antimiscegenation laws. Despite this trend, however, the Supreme Court did not refrain from fulfilling its constitutional obligation.

The fact remains that although a number of bills to authorize same-sex marriage have been introduced in the Legislature over the past several years, none has ever made it out of committee (*see* 2005 NY Senate-Assembly Bill S 5156, A 7463; 2005 NY Assembly Bill A 1823; 2003 NY Senate Bill S 3816; 2003 NY Assembly Bill A 7392; 2001 NY Senate Bill S 1205; *see also* 2005 NY Senate-Assembly Bill S 1887-A, A 3693-A [proposing establishment of domestic partnerships]; 2004 NY Senate-Assembly Bill S 3393-A, A 7304-A [same]).

It is uniquely the function of the Judicial Branch to safeguard individual liberties guaranteed by the New York State Constitution, and to order redress for their violation. The Court's duty to protect constitutional rights is an imperative of the separation of powers, not its enemy.

I am confident that future generations will look back on today's decision as an unfortunate misstep.

Judges G.B. SMITH and READ concur with Judge R.S. SMITH; Judge GRAFFEO concurs in result in a separate opinion in which Judge G.B. SMITH concurs; Chief Judge KAYE dissents in another opinion in which Judge CIPARICK concurs; Judge ROSENBLATT taking no part.

In each case: Order affirmed, without costs.